UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| THOMAS MATYASOVSZKY, ET AL | : | CIVIL ACTION NO. |
| Plaintiffs, | : | |
| | : | 3:03-CV-968 (WIG) |
| v. | : | |
| | : | |
| HOUSING AUTHORITY OF THE CITY OF | : | |
| BRIDGEPORT, ET AL, | : | JULY 21, 2004 |
| Defendants. | : | |

## PLAINTIFF'S SURREPLY
## TO DEFENDANT'S MEMORANDUM OPPOSING CLASS CERTIFICATION

Plaintiff responds herein to the following issues raised by the defendants'

memorandum opposing certification, filed June 30, 2004 ("Def. Reply"): (A) adequacy

under Fed. R. Civ. P. 23(a)(4); (B) predominance of injunctive relief under Fed. R. Civ.

P. 23(b)(2); (C) applicability of the Galvan doctrine to this case.[1]

---

[1] Defendants' Reply focuses almost exclusively on a single allegation under the Fair
Housing Act, Count I.A (exclusion from Fireside). It is therefore unclear whether they contest
class certification regarding the remaining nine types of illegal practices that plaintiffs have
identified: Count I.B (offering disabled applicants Fireside under differing terms and
conditions), I.C (steering disabled applicants out of Fireside to other complexes), I.D
(misrepresenting the availability of Fireside to disabled prospective applicants), II (Section 504
claims), III (ADA claims), IV (violating the National Housing Act by failing to offer Fireside to
disabled and elderly applicants on an equal basis),V.A (failing to provide an opportunity for

1

**A.    The Named Plaintiffs Adequately Represent the Class Because They Suffer From the Same Discriminatory Policy, and Their Interests Do Not Conflict.**

Defendants argue that the plaintiffs make inadequate representatives because (1) some of the named plaintiffs are over 55, and the Fireside occasionally admits persons over 55 whether or not they are disabled, and (2) some of the named plaintiffs are currently waiting for BHA public housing and have requested the Fireside complex, but "not everyone can be offered a unit at Fireside complex." Def. Reply at 13.

**1.    Named plaintiff Linda Dedrick, aged 50, is categorically excluded from the Fireside by the BHA's current practices, and therefore adequate to represent all class members whom the BHA excludes.**

The defendants offer an affidavit, <u>see</u> Exhibit G of Def. Reply, signed by the manager currently responsible for assigning eligible applicants units of public housing as proof that they no longer exclude disabled persons from the Fireside complex. However, the affidavit, by omitting the ages of applicants recently admitted, attempts to conceal the fact that the few non-elderly persons who are disabled who are let into Fireside now are

───────────────

disabled to demonstrate their eligibility for senior/disabled housing), V.B (expediting elderly, but not disabled, admissions to senior/disabled housing by using the Senior appointment List), and V.C (offering senior/disabled housing to near-elderly but nondisabled persons prior to offering it to the disabled). In the interests of efficiency, plaintiffs here address not only the exclusion claim actually raised by the defendants, but also the remaining claims.

all over 55. Thus, the defendants' affidavit supplied by defendants shows an absolute exclusion of all disabled applicants who, like named plaintiff Linda Dedrick, are under the age of 55.

### 2. Reconstructed waiting lists obviate conflict among members.

The proposed class members' interests in the limited supply of the BHA's senior/disabled housing stock are not in conflict with those of the named plaintiffs who hope to obtain a unit in Fireside. As to the members of the class who have actually applied and are still in need of public housing, conflict is technically not possible. The injunction requested would require the BHA to reconstruct its waiting list, restoring each of the plaintiff class members to their rightful place using the date-stamped pre-applications. The applicants' eligibility, and therefore their property interest in this lawsuit, attaches based this chronological, HUD-approved mechanism for assigning apartments, and therefore no two class members will ever have the same right to the next Fireside unit; instead, each plaintiff will be given back the right he or she should have had prior to this lawsuit–the right to choose from among *all* one bedroom units of senior/disabled housing that may be available–including Fireside units–on the day he or she arrives at the top of the waiting list. For some class members who have waited

3

several years and ultimately obtained a public housing unit, like the Pellechios, the order

in which their rights to injunctive relief by means of a transfer to Fireside will instead be

governed by reconstructing a lawful transfer waiting list. Because these procedures permit

the BHA virtually no discretion for deciding which unit to offer an applicant, conflict is

eliminated.

**B.    Rule 23 (b)(2) Applies, Because Injunctive Relief Predominates.**

Defendants argue that certification of the proposed class under Rule 23(b)(2) is

inappropriate and unnecessary under the ad hoc standard enunciated in Robinson v.

Metro-North Commuter R.R. Co., 267 F.3d 147 (2d Cir. 2001).  However, judged by

each of the factors that Robinson and other courts have subsequently considered when

performing the ad hoc determination of whether injunctive relief predominates, injunctive

relief is at the heart of the plaintiffs' case.

**1.    Injunctive relief remains necessary.**

Defendants claim, with little elaboration, that injunctive relief is unnecessary

because the BHA "acknowledges" that both the elderly and the disabled are eligible for

admission to the BHA's Fireside complex. Def. Reply at 18.  It is unclear what, if any,

obligation the BHA believes it has as a result of this statement. Nevertheless, the

4

defendants urge the Court to accept this statement as a sufficient showing that only the plaintiff's damage claims remain at issue. There are two problems with this argument. First, it ignores the need for injunctive relief regarding all of the other noncompliant practices identified by the plaintiffs. Second, even if the BHA had specifically renounced each of its past illegal practices, correcting the effects of the noncompliance in the past–effects which the defendants specifically deny the exist–would still require injunctive relief. The essential goal of this lawsuit is to force the BHA to offer public housing on an equal basis to the class members in Fireside, or any other senior/disabled housing complexes that the BHA may own. Reaching this goal will be impossible without an injunction.

### 2.    Nominal damages for due process violations are incidental.

Nominal damages are due each class member under Count V of the complaint, because the BHA's intentional practices, such as expediting elderly admissions by using the Senior Appointment List, delay their access to public housing significantly. Such damages are clearly incidental because they require no individualized proof. <u>Jordan v. Dellway Villa of Tenn., Ltd.</u>, 661 F.2d 588, 594 (6th Cir. 1981). As such, nominal damages are widely recognized as compatible with certification under Rule 23(b)(2).

5

Augustin v. Jablonsky, 2001 U.S. Dist. Lexis 10276 *27 (E.D.N.Y. March 8, 2001).

   3.    **The intangible value of injunctive relief far outweighs the value of the
         nominal damages claims and the group punitive damages.**

In addition to the factors stated by Robinson, a number of Circuits also evaluate

predominance by an overall comparison of the value of the injunctive versus monetary

forms of relief. See, e.g., Linney v. Cellular Alaska Partnership, 151 F.3d 1234, 1240 (9th

Cir. 1998). The value of the injunctive relief requested in this case–a reconstructed

waiting list and a court order to adhere to it–far outweighs the compensatory damages on

purely economic terms. Housing subsidies stay with the recipient as long as he or she

remains a tenant–i.e., potentially for the remainder of the tenant's lifetime. The economic

value of obtaining a unit of public housing is equal to at least the difference between the

amount of rent charged for public housing (30% of income) and the amount that class

member was otherwise forced to spend on market rent for a one bedroom apartment in

Bridgeport. For the class members who are entirely unable to afford housing of their own

if, and consequently lack any home, the value of being assigned a unit of public housing

is equal to at least the total market rent for a comparable apartment. The cumulative,

present value of these monetary amounts alone will far outweigh any other type of

6

damages requested in this case. Moreover, additional intangible features about Fireside, such as its physical accessibility, spaciousness and safety, will further raise the value to the plaintiff class members of having a fair opportunity to be placed there.

However, perhaps the most important benefit of obtaining an opportunity to receive senior/disabled public housing rather than monetary relief is that the procedural safeguards of public housing, such as grievance hearings and rules requiring the administrative accommodations to disabilities. The value to each plaintiff class member of regaining their rightful spot on the waiting list, and of being insured that their eligibility for senior/disabled housing will be respected by the defendants in the future, can only be truly appreciated in light of these safeguards.

**C.    Certification of a 23(b)(2) Class is a Superior Method of Litigating this Case Because the Only Damages of Value Flow From Defendants' Reprehensible Treatment of the Class As a Whole, and Not to Any Individual Member.**

Although some courts have recently refused to certify classes under Rule 23(b)(2) which contain punitive damages or emotional distress claims that are entirely dependent on individualized factors, see, e.g., Augustin, 2001 U.S. Dist. Lexis at *29-30, their reasons for doing so either do not apply here. Inclusion of limited emotional distress claims and a group-oriented punitive damages claim will not sacrifice the individual

7

rights of any class member under the circumstances of this case.

**1.    The potential for emotional distress damages is very limited.**

The nature of the discriminatory practice alleged–that the BHA successfully hid the class members' rights to housing–means that very few of the class members will have viable emotional distress damages claims. A viable claim for individualized damages claim will, in the facts of this case, have only arisen in those situations where the applicant was personally humiliated by attempting to fight the policy and experiencing the discriminatory animus firsthand. Emotional distress damages clearly will not be available to the vast majority of class members are like plaintiff Linda Dedrick, who remained unaware that her application for public housing was stalled due to discriminatory practices until she read about in the newspaper. The plaintiffs have asserted this claim and will present proof on behalf of each class member whose claims may surface as a result of the notification process following certification. But the number of persons who can make such a claim will be very small, because the prospective class members, as indigent, disabled persons, rarely had the resources or energy to question the BHA staff's exclusion of them, learn that the policy was unlawful, and then challenge it personally.

8

Moreover, because this type of harm is one that a class member could not suffer without personally interacting with the BHA staff, those class members who have a viable emotional distress claim will recognize that they have it as soon as they know of the lawsuit. Conversely, class members who, unlike plaintiff Matyasovszky, turned away *without* personally attempting to convince the housing authority to allow them to apply, will not have lost any rights to damages that they otherwise would have been able to claim. Such class members would not prevail on an emotional distress claim even if they brought it individually, because they would not be able to show a level of personal involvement to sufficient to cause distress.

2.    **<u>Robinson</u> gives this Court discretion to certify a group punitive damages claim in the context of a negative value lawsuit.**

Defendants urge the Court to view the <u>Robinson</u> standard as requiring certification of "only so much of a plaintiff's claim that seeks equitable relief." Def. Reply at 17.[2] However, the court's actual wording, and the import of the opinion as a

---

[2]    While <u>Robinson</u> finds that certification of a class for the liability phase only can be proper, some commentators have noted a further concern that the rights of both opt-outs and absent class members may be prejudiced by certification of a class under Rule 23(b)(2) for liability purposes only because nit may be a way of avoiding the nuisance factor of notifying and dealing with members who opt-out under Rule 23(b)(3). Thus, (b)(2) certification, according to

9

whole, is that cases involving non-incidental damages "may require" bifurcation and "entitlement to non-incidental damages *may* vary." Id. at 167 (emphasis added). The most significant difference between the Robinson ad hoc test and the bright line offered by Allison is that case-by-case adjudication permits the court to use its discretion under Rule 23 to shape the litigation in ways best suited to the underlying realities of the specific case. Measured by this ad hoc standard, the fact that the instant litigation is a so-called "negative value" lawsuit is a significant indicator that class litigation is a superior method for protecting each individual members' interests. See Street, at *35 (citing Allison, 151 F.3d at 419 for the proposition that the negative monetary value of a lawsuit to any individual class member has been called the most important factor in evaluating certification). Certification under 23(b)(2) with the understanding that punitive damages are requested for the group as a whole only (for the purposes of establishing a group fund)

---

the argument, encourages a kind of tacit collusion between the court, the defense counsel and the named plaintiffs. See Linda Mullenix, "No Exit: Mandatory Class Actions in the New Millennium and the Blurring of Categorical Imperatives," 2003 U. Chi. Legal F. 177, 242-243. However, there is nothing for any party to gain in this case by such supposed collusion, because the very nature of the relief requested–each members' restoration to their rightful place on the waiting list for senior/disabled public housing–demands that extensive efforts must made to notify the members. Thus, in this case, the plaintiffs clearly did not request certification under subdivision (b)(2) to avoid (b)(3), as all of the persons who applied must be contacted regardless of any variations in their damages claims.

10

is the only way to provide complete relief. The fluidity, indigence and critical dependence on government benefits of this proposed class can only be served by a "out-of-pocket" damages are largely beyond capable of economic valuation.

A group punitive damages award in this case would essentially be a form of equitable relief. Cf. Allison, 151 F.3d at 420 (noting that back pay awards are a form of equitable relief, and therefore distinguishing them from punitive damages based on emotional distress). The rationales stated by courts that have found punitive damages claims fundamentally incompatible with injunctive relief are not dispositive of this case. In Augustin v. Jablonsky,[3] for example, the court declined to certify a class of persons who had been strip searched upon incarceration. After restating the Supreme Court's BMW v. Gore standard for evaluating the propriety of punitive damages claims, the court found that "punitive damages will be non-incidental to declaratory or injunctive relief at least in those cases-such as this one-where the compensatory damages prayed for are themselves non-incidental." Id. at *29-30.

_____

[3] Judge Hurley, presiding in the Eastern District of New York, decided this case on March 8, 2001, and therefore without the benefit of the Second Circuit's articulation of the ad hoc standard of review in Robinson. Thus, the district court was applying the Allison bright-line standard that a Rule 23(b)(2) class can never contain non-incidental damages claims.

In contrast to the <u>Augustin</u> strip search plaintiffs, the only damages that could in theory be to owed the proposed plaintiff class in this case are rental reimbursements, which would be purely incidental, even by the <u>Allison</u> standard.  If the rationale not the rhetoric of courts rejecting punitive damages for mandatory classes is followed to its logical conclusion, then the punitive damages requested here are completely consistent with mandatory certification. Unlike cases such as <u>Augustin,</u> in which the sole basis for punitive redress would be the individual's reaction to a personal tort, here the basis would be a group's silent and unknowing suffering at the hands of government officials who repeatedly lied to them and their community.  A group award of punitive damages would be advantageous to the disabled and low-income members, whereas individual distributions of punitive damages awards would harm them, because the vast majority of the potential class members receive governmental benefits.  A flexible approach to damages awards was recently advocated by Judge Newman, suggesting that the traditionally wide discretion of the district court in class actions would be "appropriate for a district court to explore with the parties at an early stage" damages allocation issues. <u>See</u> <u>Parker v. Time Warner Entertainment Company, L.P.</u>, 331 F.3d 13, 29 (2d Cir. 2003) (Newman, J., concurring).  To the extent that an individual punitive damages award

12

would likely exceed the maximum amount that a plaintiff was permitted by the social

security administration, individually awarded punitive damages would only be harmful.

Thus, the only way to punish the egregious behavior of the defendants in this case without

harming the plaintiff class members by cutting off their sole source of income is to certify

a class under Rule 23(b)(2) inclusive of a punitive damages claim by the group as a

whole.

### 3.    Bifurcation will not destroy judicial economy in this case.

Even if the Court chooses to bifurcate for purposes of hearing the individual class

members' emotional distress claims, such bifurcation would not entail two trials, using

successive juries to decide the same issues.  At most, it would require a couple of hours

of additional testimony regarding the facts of the personal interactions between the BHA

staff and each class member who raises the claim.  Because the case is narrowly focused

on statements or actions indicating eligibility for senior/disabled public housing,

testimony on these interactions will cover isolated interactions of a few minutes' length.

An employment discrimination claim usually requires testimony on daily interactions

drawn from years or even decades of interactions.  See, e.g., Robertson v. Sikorsky

Aircraft Corp., 2000 U.S. Dist. Lexis 21148 *19-21 (D. Conn. September 18, 2000);

13

Street v. Diamond Offshore Drilling, 2001 U.S. Dist. Lexis 7054 *31-33 (D. Conn. May 24, 2001). In contrast, the proposed class members in this case can prove a prima facie case based on a four facts (age, disability status, date and time of application, date and time of offer) stated on two pieces of paper, the BHA pre-application and offer letters, or else a single question and answer (inquiring about Fireside, being told that is only for people over 62).

The lesser showing required of plaintiffs in this case is not only a function of the factually simpler circumstances presented by "paper" discrimination against housing applicants, but also a result of the burden shifting affect of a pattern claim–a point ignored by the defendants first memorandum opposing class certification based on the idea that an individual hearing would be required to determine whether each proposed class member was disabled. In Jordan, for example, the Fifth Circuit commented specifically on the district court's erroneous assumption that members of a housing discrimination class needed to each *individually* make out a prima facie case under the McDonnell Douglas framework for employment discrimination. 661 F.2d at 588 n.7. The Jordan court went on to note, however, that the burden of doing so would not in any case have required each individual to affirmatively prove that he or she was individually

14

targeted, but only to rebut such a showing by the defendants: "This contention, however, ignores the effect of the district court's finding of a 'pattern or practice' of discrimination. . . . Under [the United States Supreme Court's decision in Int'l Brotherhood of Teamsters v. United States, 431 U.S. 324(1977)], an individual claimant can be denied recovery only if the proven discriminator meets its burden of showing that the claimant was rejected for lawful reasons." Id. at 593-594.  As in Jordan, the members of the proposed class need not show make any *individual* showing beyond than that they would have met or did meet the nondiscriminatory selection policies–in this case, the lawful criteria for admission to senior/disabled public housing.

Because the finding of liability for a pattern of discrimination has such a dramatic effect, courts ruling on class certification prior to trial should be wary of defendants' who urge premature use Rule 23 remedial concerns in order to hugely increase the costs to the plaintiff and the court of demonstrating a pattern of liability, by forcing the plaintiff class to initiate numerous separate lawsuits. See Ewing v. Coca Cola Bottling Co., 2001 WL 767070 (June 25, 2001 S.D.N.Y.) (refusing to apply the Allison standard, because the argument "is at this stage of the proceedings premature. Allison . . . on which defendants predominately rely, arose in the context of a fully litigated motion for class certification,

15

where the court was in a position to resolve factual disputes and make findings necessary

to determine whether a class should be certified."); accord, Reeb v. Ohio Dep't of

Rehabilitation and Correction Belmont Corr. Inst., 221 F. R.D. 464, 481 (E.D. Ohio

2004) (noting that "In a pattern or practice discrimination claim such as plaintiffs have

brought, class litigation will create an appreciable measure of judicial economy even if

the remedial stage is ultimately resolved on a non-class basis.").

 **4.     Absence of a jury negates Seventh Amendment concerns.**

The substantive unsuitability of the instant case for a jury trial, due to the

document-intensive nature of the evidence, led the parties to seek a bench rather than a

jury trial. The case is free, therefore, of the Seventh Amendment concerns at play in the

employment discrimination cases that the defendants rely upon. See. e.g., Street, 2001

U.S. Dist. Lexis 7054 at *35.

**D.     The Galvan Exception Does Not Apply, as the Injunctive Relief Requested Will Require An Affirmative Order and Ongoing Court Supervision.**

Defendants request that this Court treat certification as an unnecessary formality

under Galvan v. Levine, 490 F.2d 1255 (2d Cir. 1973). Galvan provides a mechanism for

courts to avoid certification as (1) unnecessary where the defendant is a governmental

body and the plaintiff requests merely a declaratory judgment that would define the rights

of the parties, or (2) moot, if the defendant has represented to the court that the

challenged policy has been withdrawn, and the court is "confident that its judgement will

be applied equally to every member of the proposed class." McKenna v. Peekskill

Housing Authority, 83 F.R.D. 600, 606 (S.D.N.Y. 1979). Confidence is not warranted in

this case.

The defendants' supporting materials show that they do not and cannot intend to

withdraw the challenged policies, because they apparently still do not acknowledge what

compliance would look like, and what policies are being challenged.  As addressed above

in Section B.1, the defendants make absolutely no statement in their class objection that

they will withdraw any of their nine noncompliant practices, other than the policy of

excluding disabled persons from the Fireside complex.  In their memorandum, far from

representing that they have withdrawn the contested policy, as required by Galvan, 490

F.2d at 1261, they coyly ask the court to accept vague affidavits as proof while

"assuming for the sake of argument" that they ever excluded non-elderly disabled

applicants from Fireside.  These affidavits further undermine the defendants' arguments

that they are capable of complying by stating an irrelevant fact–that certain of the elderly

applicants have a disability.  Stating the disability of the elderly, who are eligible

17

regardless of their disability, suggests that the BHA may believe that can satisfy the equal admissions requirement imposed by 24 C.F.R. 960.407 by admitting elderly applicants who are also disabled. Such a practice would   Most egregiously, the affidavits they supply in support of withdrawal employ elaborate phrasing to avoid stating either the ages of the applicants or the time periods that these applicants waited to be admitted . In fact, all persons admitted by the current Manager of Resident Selection still fall within the BHA's unilaterally created age-range for "near elderly" or "pre-senior" applicants, as follows:

Additional Facts Concerning Non-Transfer Applicants Named in Morales Affidavit

| DATE OF OFFER | DATE WHEN APPLIED | AGE WHEN OFFERED | ELIGIBILITY STATUS | NAME, D.O.B. |
|---|---|---|---|---|
| 1-23-04 | 9-13-02 | 60 | disabled | M. Hunt 11-3-44 |
| 2-3-04 | 11-25-02 | 54 | disabled | P. White 6-21-50 |
| 2-3-04 | 12-2-02 | 58 | disabled | J.C. Griffin 10-26-46 |
| 2-20-04 | 11-22-02 | 55 | disabled | L. Cornell 2-7-44 |

18

| 3-15-04 | 11-13-02 | 65 | elderly | E. Pettway 4-15-39 |
| 3-22-04 | 2-25-03 | 81 | elderly | Z. Vazquez 8-1-23 |
| 5-7-04 | 1-15-03 | 64 | elderly | H. Dyer 7-2-30 |
| 5-24-04 | 1-3-03 | 60 | disabled | W. Pennix 7-14-44 |
| 6-14-04 | 2-14-03 | 56 | disabled | G. Feathers 3-19-48 |

The lack of any person under the age of 54 on this list shows that Fireside is still restricted to those deemed by the defendants elderly or near elderly. Until disability alone is treated by the BHA as sufficient to gain admission to senior/disabled housing, the defendants remain in violation of the National Housing Act. This bald attempt to hide from the Court a continuing practice of admitting only "pre-seniors" and seniors and is absolutely incompatible with a claim that the controversy over the policy is now moot. The Court has absolutely no basis for taking the defendants' word for it that they can be relied upon to act uniformly with respect to the proposed class members in the absence of certification.

19

## CONCLUSION

Evaluated on an ad hoc basis by the two measures set forth in <u>Robinson</u>, the proposed class should be certified under Fed. R. Civ. P. 23(b)(2), because only an injunction can correct the prior policy, resolve ongoing disputes about what the defendants must do to comply with the law, and monitor the defendants' claimed compliance. These important tasks predominate in all respects over the request for nominal and group-oriented damages.

Respectfully submitted,

PLAINTIFF THOMAS MATYASOVSZKY

By_____

Jennifer Vickery, Esq. (Ct24089)
Law Offices of Alan Rosner
1115 Main Street, Suite 415
Bridgeport, CT 06604
Tel. (203) 384-1245
Fax. (203) 384-1246

20

## <u>CERTIFICATION</u>

This is to certify that a copy of the foregoing has been sent by mail on this 21st day of July, 2004 to:

James Mahar and Michael Ryan
Ryan, Ryan, Johnson & Deluca, LLP
80 Fourth Street, P.O. Box 3057
Stamford, CT 06905 .

_____
Commissioner of Superior Court