



FILED

2004 OCT -4  A 11: 47

U.S. DISTRICT COURT
BRIDGEPORT, CT

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

THOMAS MATYASOVSZKY, ET AL      :   CIVIL ACTION NO.
                       Plaintiffs,      :

v.                               :   3:03-CV-968 (WIG)
                              :

HOUSING AUTHORITY OF THE CITY OF  :
BRIDGEPORT, ET AL,             :
                  Defendants.    :   OCTOBER 3, 2004
                              :

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### STATEMENT OF THE CASE

The plaintiffs, on behalf of themselves and the proposed plaintiff class of persons with disabilities seeking housing with the Housing Authority of the City of Bridgeport ("BHA"), seek preliminary injunctive relief to ensure their fair share of two public housing complexes that the BHA is charged with operating for both the elderly and the disabled, on an equal basis.

Since 1961, the Fireside Apartments and Harborview Towers were supposed to house *both* elderly and disabled tenants. Instead, the BHA has unlawfully operated Fireside as an elderly only complex, and Harborview as a

1

family complex.

To this day, the BHA has been operating Fireside as an "elderly on ly" complex without obtaining the approval necessary from the U.S. Department of Housing and Urban Development ("HUD") to designate Fireside for that purpose. By ignoring the designation process with HUD, the BHA avoided its legal responsibility under the federal designation statute to provide other alternative housing resources to the excluded group, the disabled, as a condition of obtaining permission to designate.

Without ever formally seeking designation of Fireside as an "elderly only" project, the BHA nonetheless has exercised, and continues to exercise, all of the privileges granted by the designation statute, 42 U.S.C. §1437e, including the privilege of permitting occupancy by "near elderly" tenants when there are insufficient elderly applicants to fill vacant apartments. Consistent with this abdication of its responsibilities to the disabled population of Bridgeport, the BHA also gave apartments at Harborview--the BHA's only other elderly/disabled complex--to able-bodied, non-elderly adults. Both actions violated the fair housing rights of disabled applicants and candidates for transfer by denying them much-

2

needed housing intended for their use.

In an attempt to create for the Court the appearance of compliance with fair housing laws, the BHA, over the past twelve months, has combed the waiting list to admit a number of "near elderly" disabled applicants between the ages of 46 and 61 as elderly applicants to Fireside. This kind of "cherry picking" of tenants, selecting only those few disabled applicants who would be old enough to be considered elderly once Fireside was lawfully designated as elderly only, preserves the elderly character of Fireside at a time when there are twice as many disabled Bridgeport area residents in need of housing, but also at the cost of continuing the BHA's longstanding practice of violating the rights of disabled applicants.

It is not just disabled applicants under the age of 46 who are adversely affected by this practice. Even those like named plaintiff Linda Dedrick, who are in the "near elderly" category, are harmed because under the BHA's near elderly rule, near eldelry persons with disabilities are admitted only after all eligible elderly applicants have been housed. This practice guarantees that the number of disabled persons admitted to Fireside will remain well below what it would be if the waiting list was operated in a way that did not discriminate against any disabled

applicant. The policy will not only exclude *all* class members under the 46 year old age limit set by the BHA, like proposed intervenors Kenneth Gihon and John Nelson, Jr., but will also continue subjecting all near-elderly disabled applicants who were not hand-picked for Fireside to months of additional time on the waiting list, in violation of the fair housing laws.

For these reasons, the plaintiffs, on behalf of themselves and the proposed class, move for a preliminary injunction enjoining policies and practices intended to free BHA officials from the obligation of having to manage the low income, disabled tenants. Plaintiffs seek an order enjoining the illegal operation of Fireside as an elderly only project, requiring that Harborview be operated as an elderly/disabled housing complex, and enjoining the use of age restrictions by the defendants when determining whether a person with disabilities is eligible for elderly/disabled housing. As further explained below, plaintiffs seek nothing more than what well-established federal law already requires of every housing authority.

## SPECIFIC RELIEF REQUESTED

To halt the defendant BHA's ongoing discrimination against persons with disabilities, plaintiffs respectfully request that this Court enter an order enjoining

4

defendants to:

(A) eliminate the use of age restrictions when determining whether persons with disabilities are eligible for housing at Fireside;

(B) stop assigning persons who are neither elderly nor disabled to elderly/disabled housing, including but not limited to Fireside and Harborview;

(B) provide written notice, in a form to be approved by the Court, to all BHA employees at the Resident Selection office, and at the BHA's executive offices and site management offices, that persons with disabilities, regardless of their age, are eligible and entitled to a preference for Fireside or Harborview on an equal basis with the elderly, and requiring such employees to communicate the same to BHA tenants seeking transfer, prospective applicants for BHA housing, and interested members of the general public;

(C) employ a "Pre-Application" form for Public Housing that requests of applicants information sufficient to identify persons who may be eligible for elderly/disabled housing;

(D) provide written notice to each applicant on the current general population waiting list, and each current BHA tenant, informing them of the

5

definition of "disabled person" for purposes of public housing eligibility, and of how disabled persons may demonstrate eligibility for a housing preference for elderly/disabled housing;

(E) modify the BHA's Tenant Preference form, whereon prospective tenants state their preferences for particular BHA housing complexes, to identify all elderly/disabled housing complexes for which persons with disabilities may be eligible;

(F) provide written notice to all BHA tenants currently occupying one bedroom or studio apartments stating that the BHA discriminated against persons with disabilities at the time they were assigned a unit, and stating that such tenants may be eligible to transfer to Fireside, Harborview or any other elderly/disabled public housing complex owned by the BHA and identified in the notice.

(G) make available "tenant transfer request" forms and a written copy of the rules or policies governing tenant transfer requests to all interested disabled tenants, and ensure that such submitted forms shall be date and time stamped and that the tenant's name be placed on the current waiting list chronologically in accordance with the stamped date and time;

6

(H) provide notice, in a form and in a manner to be approved by the court, that disabled persons are eligible for Fireside and Harborview and any other elderly/disabled housing operated by the BHA to all persons who applied for public housing prior to the implementation of a preliminary injunction in this case, or who inquired about applying, and to governmental agencies and non-profit organizations in the State of Connecticut providing advocacy or support for disabilities;

(I) process all applications submitted by disabled persons using the same procedures as are used for applications submitted by elderly persons;

(J) produce and maintain an elderly/disabled complex waiting list ("E/D List"), showing the chronological order in which all disabled and elderly applicants who are still on the waiting list should be offered housing, and promptly adding new applicants and transfer requests from disabled and elderly applicants immediately upon receipt;

(K) offer each unit at Fireside that becomes available in the future to the next eligible disabled applicant on the E/D List, in chronological order, until such time as the percentage of disabled tenants residing there is equal to or greater than

7

the percentage of disabled applicants on the waiting list for elderly/disabled complexes.

## FACTS

**A.      Facts Regarding the BHA's Elderly/Disabled Housing Stock.**

Since 1961, the federal government has subsidized the building and operation of public housing complexes intended solely for elderly and disabled persons ("elderly/disabled housing"). The BHA administers two such complexes, Harborview Towers and Fireside Apartments. Fireside consists of 248 ground-level apartments surrounded by grass, trees, pathways and benches and the complex is located in a residential area. Each unit has a garden area and an outdoor clothesline. Harborview consists of 240 units located in three high-rise buildings serviced by elevators. The cinder block interiors of the units preclude the hanging of pictures or draperies. The Harborview complex is bordered on one side by a train yard, and on another by a heavily trafficked street. The ground level view is of a series of boarded up buildings.

Although the statutes, terminology and sources of funding for these complexes have changed over the decades, federal law has always required the

8

admission of disabled people to any floor or building built for the elderly.[1] 24

C.F.R. §960.407(a); see Review of Designated Housing Plans: A HUD Guidebook,

August 1998, at 3 (Exhibit 1); see also Public Housing: Impact of Designated

Public Housing on Persons with Disabilities, GAO/RCED-98-160, 6-9-98, at 3.

The current regulatory formulation requires that public housing authorities give

"preference to elderly families and disabled families equally in determining priority

for admission to mixed population developments.  The PHA may not establish a

limit on the number of elderly or disabled families who may be accepted for

occupancy in a mixed population development."  24 C.F.R. Sec. 960.407(a).  In

accord with this obligation, the Department of Housing and Urban Development

("HUD"), requires housing authorities not only to inform the disabled of their

eligibility, but also to "give applicants an opportunity to show that they qualify for"

elderly/disabled housing.  24 C.F.R. § 960.206(a)(4).

    With the passage of the Housing and Community Development Act of

---

[1]  Terms for this housing have included "senior" and "elderly" projects, as HUD then
defined those terms to include disabled persons. See, e.g., 24 C.F.R. §880.202(c) (withdrawn).
HUD's current term for elderly/disabled housing  is "mixed population" housing. 24 C.F.R.
§912.2.

1992, Congress gave public housing authorities the option of designating mixed population projects as "elderly only" or "disabled only," *provided* that they first obtained HUD's approval of a designation plan meeting specifications stated in the Housing Opportunity Program Extension Act, see 42 U.S.C. §1437e (a)(1) and (d), including a description of the additional resources or housing assistance that the housing authority will provide to the excluded group. See PIH Notice 97-12 (Exhibit 2).

All parties agree that, to date, the BHA has neither filed for nor received HUD's approval to designate Fireside as elderly only. See Amended Answer, at ¶17. As of September 2003 the BHA had announced to HUD its plans to submit formal "elderly only" designation requests for 613 units, including all of Harborview and Fireside. See Exhibit 3. However, Defendant Jonas DeGuzman announced at a July, 2004 public hearing that it was temporarily withdrawing these plans from HUD's consideration because of the pendency of this lawsuit.

**B.    Facts Regarding the BHA's Public Representations that Fireside Was Designated Elderly Only.**

Until the filing of this lawsuit, BHA officials were never secretive about

10

their desire to exclude the disabled from Fireside and to keep the disabled out of public housing. By 1999, BHA officials and representatives had already expressed their intention to operate Fireside as an elderly complex over dissenting voices of advocates for the disabled.

Even the BHA's legal counsel, Joseph Siciliano, expressed his belief that Fireside was lawfully operated as an elderly only complex. On September 2, 1999, he rejected an inquiry by a Connecticut Legal Services attorney representing a non-elderly, mobility impaired tenant expressing a desire to be housed at Fireside by stating: "As you have been advised, Fireside Apartments is a designated senior citizen complex and cannot be made available to Ms. Williams." See Letter from Attorney Siciliano dated September 2, 1999 (Exhibit 4). When the Legal Services attorney responded that Fireside has not been approved by HUD for designation as an elderly only project, and, thus, that no legal impediment prevented a referral of his client to Fireside, Attorney Siciliano remained silent on the topic of designation, and the BHA referred Ms. Williams to a project other than Fireside. See Griffin letter dated September 23, 1999 (Exhibit 5), and Siciliano letter dated September 30, 1999 (Exhibit 6).

11

When the City of Bridgeport's Housing Authority Fair Housing Officer, Joseph Wincze, learned of the claims made by Attorney Siciliano, he too wrote to BHA counsel explaining that exclusion of the disabled from Fireside was illegal, and that the BHA required permission from HUD to designate a complex as elderly only. See Wincze letter dated October 19, 1999 (Exhibit 7). Neither Attorney Siciliano nor any other BHA representative responded to Mr. Wincze' October 19, 1999 letter, or to his follow up phone call.  See Wincze Aff. (Exhibit 8).

The BHA continued to publicly state that Fireside was "elderly only" even after plaintiff Matyasovzsky, one of the many prospective applicants who had been told he was ineligible for Fireside based on his disabled status, filed a claim of discrimination with the Connecticut Commission on Human Rights and Opportunities ("CHRO") in early December, 2002.  On or about January 2, 2003, in papers opposing Matyasovszky's claim for relief, defendant DeGuzman explained to CHRO the BHA's position that the"Fireside Apartments were limited to elderly only residents but we would not deny disabled applicants." (Exhibit 9). DeGuzman further clarified this somewhat contradictory statement in March, 2003, when he told the Housing Litigation Director for Connecticut Legal Services that

12

the BHA was informally operating the Fireside and Harborview complexes as elderly only. See Tenenbaum Aff.,. sworn to August 11, 2004 (Exhibit 10).

In its defense of this proceeding, the defendants have taken the position that the BHA never operated Fireside as a *de facto* designated elderly project, notwithstanding their statements recited above.

## C.    Facts Regarding the BHA's Implementation of the "Elderly Only" Policy at Fireside.

The defendants implemented their oft-stated policy to exclude the disabled from Fireside by misrepresenting to applicants and the public that Firesde was elderly only, as if designation had already occurred, and by continuing to follow the policies set forth in a section on "Units Designated for the Elderly" in its manual, see ACOP, chapters 3 and 4 (Exhibit 11).

### 1.    The BHA Misled the Disabled By Stating That They Were Ineligible for Fireside.

BHA officials and employees, and particularly employees at the Resident Selection office, who have the greatest amount of contact with potential applicants, have consistently told disabled potential applicants that Fireside is only for the elderly. As will be seen below, the BHA's elderly only plan proceeded largely

13

unimpeded, as evidenced by the age of the current population.

The named plaintiffs were each told by BHA employees that, as disabled persons under the age of 62, they were simply not eligible for housing at Fireside. In October of 2000, when plaintiffs Sandra and Joseph Pellechio were interviewed for public housing, they asked to be assigned a Fireside apartment. At 50 and 51 respectively, they were told that they were not old enough to be assigned to Fireside, and that disabled applicants were limited to Harborview Towers and Trumbull Towers. They were assigned to Harborview shortly thereafter. See Complaint in Intervention of Sandra and Joseph Pellechio, dated December 30, 2003, at ¶ 24. Similarly, when lead paintiff Thomas Matyasovszky contacted BHA offices in 2002, he too was falsely told that only elderly people can be assigned to Fireside. And recently, in July, 2003, when plaintiff Linda Dedrick informed an employee at the Resident Selection Office that she sought an assignment at Fireside because of her mobility impairment, she was told that only elderly applicants could be assigned to Fireside. See Plaintiff's Motion to Intervene dated January 26, 2004 Dedrick Aff., ¶ 5.

These plaintiffs' experiences were shared by many others, including

14

disabled BHA tenant Karen Roman. In 2002, Roman enlisted the help of BHA

official Bernavin Armstrong to help her with her request to transfer to Fireside

from the Marina Village complex. Even Armstong's assistance was not enough to

overcome the policy barring the disabled from Fireside. The denial of Ms.

Roman's transfer because she was not elderly prompted Mr. Armstrong to request

from Tracey Zennis, then manager of the Resident Selection office, and other BHA

officials, an explanation of this policy. A copy of Mr. Armstrong's memo

documenting this incident is attached as Exhibit 12. Though Ms. Roman

complained about the denial to Betty Jones, in HUD's Hartford office, and to then

Executive Director Collin Vice, without response or result, she too was eventually

referred elsewhere rather than being admitted to Fireside. See Roman Aff. (Exhibit

13). Indeed, as recently as last month, disabled applicant and proposed intervenor

Kenneth Gihon, age 41, was interviewed for public housing. When asked to

choose his first, second, and third choices among the BHA complexes, Mr. Gihon

told the Resident Selection Office employee that his first choice was Fireside.

Upon learning that Mr. Gihon was disabled, the employee maintained that Fireside

was currently "full." She produced a "preference" form and wrote "Harborview"

15

on it as the first choice and "Fireside" as his second choice, despite the fact that under the normal timeframe for processing applications, Mr. Gihon would not in any case have been ready to be assigned an apartment for months to come. See Proposed Intervenor Kenneth Gihon's Motion and Affidavit, filed September 24, 2001.

Finally, all potential applicants who visited the BHA's web site were similarly misled. See Exhibit 14. The description of available housing complexes on the site names Fireside and other locations as "elderly only" complexes.

2.    **The BHA Assigned the "Near Elderly" to Fireside Without Regard for Disability As If Fireside Had Been Lawfully Designated as Elderly Only.**

As discussed above, the BHA not only operated Fireside as if it had been legally designated by HUD as an elderly only project, but also took advantage of this elderly only pretense to admit non-disabled, non-elderly persons to Fireside rather than disabled applicants.

In a lawfully designated project, a public housing authority is allowed to expand the scope of who is eligible to live in an elderly complex by including the near elderly. The term "near elderly" is defined by statute to include persons

16

between the ages of 50 and 61, 42 U.S.C. Sec. 1437a, but it is unclear whether the

BHA uses this legal definition.  When describing Fireside, the defendants instead

have referred to a 55-61 bracket they call "pre-senior" in some official

communications, or to a two-tiered grouping of applicants 55-61 and 46-54

described in their 2002-2003 ACOP.  See Exhibit 11, Section E at p. 47.

However, 42 U.S.C. Section 1437e(a)(3) only permits "near elderly" persons to be

placed in a project originally regarded as "mixed occupancy" if the public housing

authority obtains permission from HUD to designate the project as elderly only

and it determines that there an insufficient number of elderly persons to fill all

available units.  By these standards, the BHA's version of near elderly eligibility

and the very use of the category for determining eligibility have always been

blatantly unlawful.

Though without a lawful designation, the BHA has recruited and admitted

"near elderly" applicants to Fireside, to the exclusion of the disabled. It published

advertisements seeking applications from "pre-senior and senior citizens age 55

and over." See Connecticut Post on March 13, 2002 (Exhibit 15).  During her

tenure as Executive Director of the BHA, defendant Vice also personally wrote to

17

fourteen different community leaders soliciting applications for Low Income

Public Housing from "pre-seniors and senior citizens age 55 and over" for the

BHA's so-called "age restricted housing complexes." See Letter from Vice to

Community Leaders dated March 12, 2002. (Exhibit 16).[2]

That these recruited near elderly applicants were regarded and processed as

elderly applicants is proven by their inclusion with the elderly on an expedited

interviewing schedule called the "Senior Appointment List." (Exhibit 17). Being

offered an interview is the crucial first step in the application process–an applicant

cannot do anything to move the process along until he or she has been interviewed.

Interviews are ordinarily scheduled by sending a letter to all the persons who pre-

applied on a given day. The Senior Appointment List was an exception to this

practice that significantly reduced the time it took for an elderly applicant to be

deemed ready for assignment to public housing. See Chart: Denial of Housing Due

to Fireside Policy: Willie Penix & Antonio Velez (Exhibit 18).

---

[2]As indicated on the list of offices copied on the letter, notice was provided to the Office of Persons with Disabilities for the City of Bridgeport which is directed by Jeri Boyd, who, at the time notice was provided, was also a member of the BHA's Board of Commissioners. Upon information and belief, Ms. Boyd and her office never took any action to challenge BHA policies or otherwise protect disabled people seeking BHA housing.

In keeping with the BHA's decision to ignore disability as a factor in admissions, *both* disabled and non-disabled "near elderly" applicants' names appear on the Senior Appointment List. Nevertheless, Harry Daniels, 54, and Judith Montes, 50, were claimed in affidavits by Anita Falco and Millie Morales to ~~be persons admitted as disabled applicants, despite the fact that the BHA had, by~~ putting them on the list, interviewed them based solely on their near elderly ages. The presence of just as many non-disabled applicants as disabled applicants in the near elderly age group on the list were not disabled shows that this category was status (elderly) based. Ms. Taylor and Ms. Hartl, in the chart below, are examples of non-disabled near elderly persons assigned units off the Senior Appointment List.

| Name | Complex | Date of Offer | Age at Offer |
|------|---------|---------------|--------------|
| Cheryleann Taylor | Fireside | 5-15-03 | 58 |
| Doris Hartl | Harborview | 6-18-02 | 51 |

This practice of providing expedited interviews of "near elderly" applicants who had been identified on the special appointment list for elders, rather than interviewing all applicants in the order that they applied, appears to have been

essential in order to keep Fireside full. The persistent problem with vacancies was

a key factor in devising these methods of processing applications, according to

Tracy Zennis, the manager who instituted the Senior Appointment List. <u>See</u>

Zennis Depo. Exhibit 19.

Bridgeport Fair Housing Officer Joseph Wincze opposed the housing of

"near elderly" tenants in place of the disabled when he was asked to review the

BHA's Annual Plan for 2002.  Wincze questioned the legal basis for who the BHA

considered to be "near elderly." <u>See</u> Wincze letter dated June 26, 2002 (Exhibit

20). Mr. Wincze indicated that this policy would violate discrimination laws to the

extent it displaced eligible disabled tenants. <u>Id</u>. On June 28, 2002, defendant Vice

responded by stating that the BHA would scale back its definition of "near elderly"

by raising the minimum age for near-elderly status from 46 to age 55, though there

is no evidence that this was done.  She first explained that "resources will be made

available for persons who are disabled" who will be excluded from

elderly/disabled housing, but then added  that "we must advise that we have had

unsuitable conditions when we mixed the elderly and disabled communities

together in a housing situation thereby making it necessary that we identify certain

20

complexes as elderly only." See Vice Letter dated June 28, 2002, numbered

paragraph 3, (Exhibit 21).

These statements led Mr. Wincze to re-visit the possibility that Fireside was

already being operated as an elderly only complex.  Mr. Wincze's suspicions were

confirmed by Tracey Zennis, who, in 2002, was managing the Resident Selection

office, and by defendant DeGuzman. They verified that the BHA was excluding

the disabled and assigning apartments at Fireside only to the elderly. Mr. Wincze

relayed the results of his investigation to defendant Vice, with a copy sent to Betty

Jones of HUD's Hartford office. Wincze letter dated December 2, 2002 (Exhibit

22).  He received no response from either HUD or the BHA.

Although defendant Vice's statement mentioned the need to devote equal

alternative resources to the disabled, the BHA has never done so. Defendant

DeGuzman, for example, admitted in his deposition that the BHA's plans for the

disabled contemplated using *existing* Section 8 vouchers to house the disabled..

See DeGuzman Depo. (Exhibit 23).  Section 8 subsidies have not been made

available for the excluded group thus far.

As defendant Vice's exchange with Wincze shows, the BHA never based

21

its decision to designate Fireside elderly only on an assessment of the housing

needs of those groups in Bridgeport. The defendants' most ambitious plans for

elderly designations, which included extending the policy to 20% of the BHA's

units, were announced in September, 2003, only one year after defendant Vice had

reported to the BHA's Board of Commissioners that there were just 55 applicants

for elderly housing on their general waiting list of approximately 1,000

names–about 5% of the list. See BHA Minutes of September 9, 2002 (Exhibit 24).

Reliable third party sources confirm the disparity between the needs of

disabled applicants and elderly applicants at the time these designation plans were

formulated. Sources such as U.S. census data, which the BHA was required to

consider as substantive input into its annual plans, showed that about twice as

many disabled people in the Bridgeport area were in need of affordable housing as

compared to the elderly at this time. See Annual and Five Year Plan 2003,

Statement of Housing Needs, (Exhibit 25). The City of Bridgeport's Affordable

Housing Plan, required by HUD as a condition for continued receipt of federal

assistance, concluded that housing for the elderly in Bridgeport is a low priority,

based on the ample number of privately owned complexes devoted to the elderly.

22

See CHAS (Exhibit 26).  Adopting the near elderly policy in the face of these numbers could only have been a response to the defendants' desire to preserve the elderly only character of Fireside, not an attempt to serve the housing needs of its jursidiction, since the near elderly group's needs were already being served.

### 3.    Results of the Elderly Only Policy at Fireside

The BHA's recruitment of near elderly tenants and the creation of an expedited Senior Appointment List succeeded in preserving the elderly character of Fireside.  Exhibit 27 lists all of the residents of Fireside as of March, 2004.  All occupied apartments housed either elderly or near elderly tenants.  Tenants who were elderly on the date they were offered a unit occupied 186 of the 240 occupied apartments in the complex. The remaining  apartments were occupied by near elderly tenants.  Of the 54 near elderly tenants, 34 were disabled as evidenced by their receipt of Social Security disability benefits, and 20 were not disabled.

### D.    Facts Regarding Failure to Offer Disabled Applicants Other Housing.

The BHA not only fails to offer the disabled their fair share of Fireside, but it also fails to offer disabled applicants as many units as it offers the elderly in any of its complexes.  Thus, exclusion from Fireside is part of a more pervasive

23

discrimination evident throughout the BHA's policies and housing assignments.

**1.      The BHA Modified its Application to Ignore Disability as a Basis for Eligibility for Public Housing.**

In or about 1999,  the BHA deleted questions from its initial application form (commonly referred to as a "Pre-Application") that were intended to solicit information that would identify persons with disabilities who may be eligible for elderly/disabled housing.  Specifically, it deleted the question: "Are you qualified for a unit available for a person with a disability?" which was followed by the notice that "(s)ome evidence of your eligibility may be required." See Pre-Application submitted in March, 1998, question 10 (Exhibit 28). An earlier version of the application had included the similar question: "Is the head of household handicapped or disabled?" See Pre-Application submitted in April, 1993, question 10 (Exhibit 29).  The pre-application that replaced these prior versions and that is currently in use requires that age and date of birth be listed, thereby identifying eligible elderly tenants.  However, it fails to ask any question that would identify whether the applicant is disabled and therefore eligible for elderly/disabled housing. See Pre-application submitted on October 22, 2002

24

(Exhibit 30).   With this revised form, the only indication that an applicant is

disabled is by whether the applicant reports receipt of Social Security disability

benefits as his or her income on the application.

Pursuant to public housing regulation, the definition of a "person with

disabilities" includes a person who "has a disability, as defined in 42 U.S.C. §423"

which is the statutory section defining the meaning of "disabled" for purposes of

determining entitlement for Social Security disability benefits.  5 C.F.R. §5.403.

This regulation defines a disabled person as either a person who has been

determined eligible for Social Security disability benefits, *or* as a person who has a

physical or mental impairment that meets the Social Security standard for

"disabled," but who may not yet have been determined to be disabled by the Social

Security Administration.  This definition is reflected in the BHA's own ACOP.

Exh. 11, Chap. 4, p. 50.

The current pre-application only succeeds in identifying those persons who

already receive disability benefits as "disabled."  As a result, it fails to count as

disabled those disabled people who are waiting, sometimes for years, to have their

claims finally adjudicated at Social Security, or who recieve some other benefit

25

such as a pension.  These persons are not listed on the BHA Waiting List as

disabled and therefore are not considered for elderly/disabled housing.

   In this manner, the BHA significantly underestimates the number of

disabled persons on the waiting list.  For example, proposed intervenor Kenneth

Gihon's was not being processed as a person with disabilities.  Mr. Gihon is a

homeless 41 year old man who is severely disabled by both physical and mental

impairments, and yet was not listed on the waiting list as "disabled"; because his

claim for disability benefits at Social Security has not yet been granted, he was not

regarded as disabled by the BHA's Resident Selection office.  See Affidavit of

Proposed Intervenor Kenneth Gihon, filed September 24, 2004.  Because he seeks

housing only for himself, and was not identified as "disabled," a Resident Selection

Office employee informed him that his housing options were limited to a one

bedroom apartment at Marina Village.  Mr. Gihon was familiar with Marina

Village and knows it to be drug infested, noisy and dirty.  Id.. ¶ 7.  The Resident

Selection employee produced a "Tenant Preference Form" form and wrote down

on Mr. Gihon's behalf that Marina Village was his first choice.  Id.

   Upon advice of counsel, Mr. Gihon then delivered to the BHA medical

treatment records which document his disability. After reviewing the records, the
Resident Selection employee informed him that he would be considered for
elderly/disabled housing and that he would not be referred to Marina. Id.

Public housing authorities must "inform all applicants about available
preferences and must give applicants an opportunity to show that they qualify for
available preferences," such as eligibility to live in housing for the elderly and
disabled. 24 C.F.R. §960.206(a)(4). Mr. Gihon avoided being undercounted and
deprived of his right to elderly/disabled housing only with assistance of counsel
that is not available to the vast majority of applicants. The BHA's current
"disabled blind" application ensures that it will fail to properly identify and inform
virtually all disabled applicants whose applications for disability benefits are not
yet adjudicated.

Perhaps the most significant cause of the BHA's failure to count applicants
as disabled is administrative error. For example, ten of the pre-applications
submitted in February 2003 were from applicants who indicated on the application
that they were already receiving Social Security disability benefits when they
applied. Yet only four were identified on the waiting list as disabled, see Exhibits

27

31 and 32, meaning that the number of disabled applicants in that month alone was underestimated by 60%. [3]

    2.    **By Expediting Elderly and Near-Elderly Applicants, the BHA Delays Disabled Applicants' Access to *Any* Public Housing.**

Excluding all disabled persons not deemed "near elderly," as well as all but a handful of those qualifying as near elderly required the BHA to abandon its standard method for processing applications and caused vacancies. For example, the Senior Appointment List described above required the BHA to operate contrary to the portion of the ACOP which states that "All applications will be maintained in order of date and time of application receipt." See Exhibit 11, p. 44,

---

[3] Throughout this memorandum, whenever the number of persons with disabilities on the waiting list for July, 2004 is used for statistical purposes, the plaintiffs have added to the number of disabled that can be identified solely by use of the waiting list itself an additional 60% of that number. Thus, while the number of names on that List that have a "D" for disability after it number 179, plaintiffs estimate that there are an additional 60% or 286 persons with disabilities actually on the list. This practice is justified by the random examination of Feburary, 2003 discussed above, which showed that many applicants who expressly state that they receive Social Security disability benefits are not processed as disabled. It is not possible to know the number of disabled persons who are undercounted because their disability claims with Social Security are still pending and they are unable to indicate on their application that they receive such benefits and are therefore disabled. The BHA bears full responsibility for the uncertainty here since they are responsible for their negligence in failing to record the disabled who have been granted Social Security and for the intentional and wilful ignorance of the BHA regarding applicants whose disability claims are pending.

28

Introduction.   Its larger effect was to speed the process for all elderly applicants, as demonstrated below.  A number of "near elderly" applicants  interviewed off of the Senior Appointment List were admitted to either Fireside, but others became part of the elderly majority at Harborview and the scattered site units.   Examples of near elderly persons –both disabled and non-disabled– who were interviewed off of the Senior Appointment List and assigned units in elderly/disabled housing other than Fireside are set forth below:

| Name | Complex | Date of Offer | Age at Offer |
|------|---------|---------------|--------------|
| Korah Sternberg | Scattered Site | 9-25-02 | 55 |
| Mary Breeden | Scattered Site | 7-3-02 | 57 |

As a result, many disabled applications sat unprocessed until and unless they were needed to fill vacant units, as evidenced by the much longer delays in receiving housing experienced by the disabled as set forth below.

The disparity in interviewing effects the BHA's entire application processing timeline, such that a disabled applicant during the past year might still wait seven or eight months more than elderly applicants to be granted an intial

29

interview by the BHA. <u>See</u> Individual Comparison: Awilda Rosado (Exhibit 37).

The individual comparison above appears to be true over the entire class of

disabled applicants, as illustrated by the group chart below which shows the

number of days that successful applicants in each eligibility category have waited

for a unit of BHA public housing. It was compiled by first determining the number

of days waited, by counting the days that elapsed from the date when the initial

pre-application was filed until the date that a unit of public housing was offered to

the applicant, and then averaging the number of days waited for members of the

same eligibility category.  It includes data gathered from every file that

defendants' counsel presented to plaintiff's counsel as belonging to a current tenant

of a one-bedroom unit of BHA public housing, provided that such files indicated

both the date when the tenant applied and the date when the tenant was offered a

unit. The data for the complexes - Fireside, Harborview, Marina Village and

Scattered Sites - may be found in Exhibits 27, 34, 35, and 36.  The chart considers

near elderly persons who have disabilities together with younger disabled people

for purposes of determining the delay.

## AVERAGE NUMBER OF DAYS WAITED FOR PUBLIC HOUSING

| Eligibility Status | Fireside Avg. | Harborview Avg. | Marina Avg. | Scattered Sites Avg. | All 1 BDR Avg. |
|---|---|---|---|---|---|
| **Elderly** | 268 | 236 | 107 | 173 | 196 |
| **Near-Elderly (non-disabled persons aged 55-61)** | 294 | 303 | 166 | 222 | 241 |
| **Families (non-disabled persons aged 18-54)** | NA | 289 | 509 | 233 | 344 |
| **Disabled** | 382 | 332 | 542 | 241 | 374 |

The chart above shows that elderly applicants are housed on average within 196 days, wheras the process takes disabled applicants 374 days. This disparity suggests that delayed interviewing costs disabled applicants at least six months of shelter, as compared against the elderly.

**3.      Recent Assignments Continue to Favor the Elderly.**

Defendants currently claim that they are properly operating Fireside "as an elderly/disabled complex and that non-elderly disabled applicants are eligible for units there." Def. Mem. Opposing Class Cert., dated June 30, 2004. They cite to

31

two affidavits, one from Marmily Morales, the current manager of the Resident

Selection office, and one from Anita Falco, its former manager. Their affidavits

list assignments of apartments at Fireside between from July, 2003 through June,

2004. These affidavits list each new tenant as either over 62 years of age or not,

and either disabled or not, without stating whether disability was the basis on

which the housing was offered. Ten are said to be disabled and under the age of 62

but it is not disclosed that all ten persons are withing the near elderly definition

established by the BHA of between ages 46 and 61. Fifteen person are 62 and over

and are therefore, by definition, elderly, though the BHA appears to claim these

individuals as disabled admittees.

Since every new Fireside tenant during this period was, consistent with past

practice, either an elderly or a near elderly applicant, it is fair to assume that they

were determined categorically eligible as elderly and near elderly under the illegal

de facto elderly only operation established by defendant. Even if the near elderly

recipients are considered as having a "disabled" eligibility status for purposes of

this discussion, the elderly receive the greater number of assignments even though

they make up a smaller percentage of the elderly/disabled population on the

32

waiting list.

In the Morales and Falco affidavits, the BHA focuses on new assignments made to Fireside during the July, 2003 through June, 2004 time period. What is more pertinent to understanding the Falco/Morales affidavits are the offers made by these two BHA officials. not just actual assignments. When all offers to one bedroom units made by Falco/Morales are considered, the bias is clearly revealed and heavily weighted in favor of the elderly.

During this time period, and based on electronic note histories kept for individual applicants and log sheets maintained at the relevant projects showing all offers made to that project, it appears that Falco/Morales made 80 offers of one bedroom apartments. These offers are presented in a chart that is identified as exhibit 39.[4]   The Chart shows that the elderly received 18 out of 28 offers (64%)

---

[4] Plaintiffs cannot be sure that all offers made by Falco and Morales can be identified. Ms. Morales testified at deposition that she made erasures on the logs particularly of people who received offers but who did not accept them. She also claims that she re-wrote the log of offers so as to have a neater version of the log. When she re-wrote the logs, she did not include all offers that were not accepted. Exhibit 33, Morales deposition testimony, last page of exhibit. The erasures can be detected on copies of the logs provided through discovery. Exh. 40. These offers should also be reflected in the electronic note histories maintained for each applicant. However, it appears that some note histories have been electronically stripped of all reference to offers that were not accepted. The logs, which reflect, for example, a faint, erased reference to three offers