made by Falco/Morales for Fireside apartments. Only 10 of 28 offers (36%) were made to the disabled. See Chart of One Bedroom Offers July 2003-July 2004 (Exhibit 39). These lob-sided numbers exist even though only strictly elderly persons 62 years of age and older and near elderly persons with disabilities between the ages of 46 and 61 were offered units, and the near elderly, for the sake of argument, are considered as disabled and not as elderly, which would be the truthful and accurate way to assess their eligibility status under the circumstances.

As the chart indicates, the elderly received 38 (46%) of all the 80 offers made by Ms. Falco and Ms. Morales of any unit of one-bedroom public housing, even though this eligibility group made up just 154 (20%) of the 793 total number of persons on the waiting list in July of 2004. Exhibit 32, Wait List, July 2004. Disabled persons under the age of 46 overall received just 7 of the 80 Morales/Falco offers, even though they make up at least 23% (179) of the July 27, 2004 waiting list, but probably closer to 36% (286 of the 793) if an estimate of the

---

made to elderly applicant Ernest Garner are not included in the note history kept for Mr. Garner. See exhibit 40. Whether Ms. Morales had some other motive for erasing the unaccepted offers is not known just as it is not known why notations of offers made that were not ultimately accepted have been stripped from the note histories. It is fairly certain, however, that plaintiffs have not been provided with the evidence for all offers made by Falco/Morales.

34

number of disabled persons who were undercounted because of administrative error or failure to count applicants with disability claims pending is factored in at a level of 60%.

**E.    Facts Regarding the Named Plaintiffs**

Plaintiff Linda Dedrick is 51 years old, disabled by severe arthritis and orthopaedic impairments affecting her back and legs, who relies entirely on Social Security disability benefits as her sole source of income. Ms. Dedrick is currently homeless.

Ms. Dedrick filed an application for a public housing unit with the BHA on June 24, 2003. Until recently and for the past several years,, she had been living in the neighborhood of the Fireside Apartments. Ms. Dedrick wants to remain in the neighborhood and she needs a ground floor unit due to her mobility impairments. Fireside was a good fit for her because it is in her neighborhood and all units are on the ground floor. In July, 2003, shortly after she applied, Ms. Dedrick contacted the BHA to inquire about the availability of Fireside apartments. She was told by a BHA representative that at 50 years of age, she was not eligible for Fireside, and that she would not be eligible until reached age 62.

35

By February, 2004, the premises that Ms. Dedrick was renting had declined to an uninhabitable condition. Water leaks in the kitchen sink area, in the bathtub and shower, resulted in housing code violations. The furnace was tagged so that it could not be operated in or about February, 2004 so that it could not be operated because of the smell of leaking gas. The water heater for Dedrick's apartment also leaked. Other violations regarding peeling paint and the need for cosmetic repairs were also recorded. Ms. Dedrick paid approximately 72% of her income for the privilege of living under these conditions.

As a result of these conditions, Ms. Dedrick eventually was compelled to vacate her home on or about May 14, 2004. She has been homeless ever since. She put all of her furniture and personal property in storage until she could secure habitable, affordable housing. Ms. Dedrick carries a suitcase with her at all times containing several changes of clothing and several personal items. She stays alternately at the homes of one of her daughters, a son, and a friend. She moves from place to place every other day so as not to wear out her welcome at any one of the three places.

Plaintiffs Sandra and Joseph Pellechio were near elderly and were receiving

36

Social Security disability benefits when they first sought BHA housing. They requested a placement in Fireside because of amenities there and because it appeared better maintained. They were informed by a Resident Selection office employee that she could not be referred to Fireside as a disabled person because Fireside was available only to the elderly age 62 and above. The Pellechios were instead referred to Harborview Towers.

Because Harborview is noisy due to the heavy traffic outside the Towers and due to the proximity of a trainyard, the Pellechios sought to transfer to Fireside. They have submitted a letter from their doctor stating that a transfer is medically appropriate. To date, the Pellechios' transfer request has not been acted upon.

## ARGUMENT

The named plaintiffs and the proposed plaintiff class are suffering irreparable harm under the defendants' purportedly new practices. The named plaintiffs and proposed class members move this Court for injunctive relief based on the strong likelihood that they will succeed on the merits of their claims under the Fair Housing Act.

37

# I.    THE PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS THAT THE DEFENDANTS INTENTIONALLY DISCRIMINATED BASED ON THEIR DISABLED STATUS.

### A.    Standard

#### 1.    Standard for Injunctive Relief Under the Fair Housing Act.

The Fair Housing Act prohibits both (1) policies that purposely discriminate, and (2) policies that have a discriminatory effect, also known as a disparate impact. See, e.g., Cason v. Rochester Housing Authority, 748 F. Supp. 1002, 1007 (W.D.N.Y. 1990). Injunctive relief is available under either theory. See, e.g., Stewart B. McKinney Foundation, Inc. v. Town Planning and Zoning Commission of the Town of Fairfield, 790 F.Supp. 1197, 1212-16 and 1220-22 (D. Conn. 1992). Where the statutory prerequisites for an injunction have been met, the movant is entitled to relief regardless of whether the party opposing the motion claims a good faith intention to obey the law. United States v. Youritan Construction Co., 370 F. Supp. 643, 651 (N.D. Cal. 1971).

Proof of a violation of the Fair Housing Act creates a rebuttable presumption of irreparable harm. See McKinney Foundation, 790 F.Supp. at 1208 (collecting cases and citing Moore's Federal Practice, vol. VII, ¶ 65.04[1] (1991)

38

for the proposition that "If the preliminary injunction is sought under a statute which expressly authorizes such relief, irreparable injury need not be demonstrated and it is sufficient to show that the statutory conditions have been met.")). Injunctive relief is specifically provided for by Section 3613(c) of the Fair Housing Act.

### 2.    Standard for Proving Discriminatory Intent.

Plaintiffs alleging intentional discrimination under the Fair Housing Act need not show that the desire to discriminate was the sole factor leading to the discriminatory actions, only that it was among the factors taken into account by the alleged discriminators. <u>Village of Arlington Heights v. Metropolitan Housing Development Corp.</u>, 429 U.S. 252, 265-66 (1977).  Purposeful discrimination is to be evaluated by means of "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." <u>Id</u>. at 266.  In conducting this inquiry, courts analyze an action alleged to be purposefully discriminatory by reviewing (a) the impact of the action; (b) the historical background behind the action; (c) the sequence of events leading up to the action; (d) departures from normal procedural sequences in taking the action; (e) departures from normal substantive criteria in

39

taking the action. <u>McKinney Foundation</u>, 790 F.Supp. at 1212.

The federal Fair Housing Act, and specifically 42 U.S.C. Sec. 3604(f) proscribe discrimination against renters based on handicap. The Act defines handicap as (1) a physical or mental impairment which substantially limits one or more of a person's major life activities, such as work. 42 U.S.C. Sec. 3602(h); 24 C.F.R. Sec. 100.201(b). It therefore covers all who meet the Social Security definition for disability, which establishes a standard for proof that a claimant is unable to work. Section 3604(f)(1) proscribes discrimination in the rental, or to otherwise make unavailable or deny, a dwelling to any renter because of a handicap. Section 3604(f)(2) makes it unlawful to discriminate against any person in the terms, conditions, or privileges of rental of a dwelling because of a handicap.

**B.    The Plaintiffs Present a Prima Facie Case of Intentional Discrimination Under the Fair Housing Act.**

As the facts section above demonstrates, the proposed class of plaintiffs are a protected group under the Fair Housing Act, have been denied housing by the defendants, and have demonstrated by means of the attached Exhibits that the housing remained thereafter available. Their case, in essence, is that employing

40

additional, unauthorized eligibility criteria, such as a near elderly or elderly age limit, to exclude from Fireside the entire disabled population under the age of 46 is contrary to federal law, which intended to provide housing for disabled persons of *all* ages, and not just those deemed worthy by the BHA. Case law is clear that a housing authority may not comply with the federal fair housing laws by electing to provide housing to just one portion of the protected group, even though the entire group is eligible by law. In <u>Williamsburg Fair Housing Committee v. New York City Housing Authority</u>, 493 F.Supp. 1225 (S.D.N.Y. 1980), for example, the housing authority's decision to informally designate 75% of its apartment units for whites, and 25% for Hispanic and black applicants was deemed intentionally discriminatory, even though a small portion of blacks and Hispanics had indeed been housed. Specifically addressing the defendants' argument that no discrimination had occurred because no one was ever *permanently* denied an apartment, the court found that causing black and Hispanic applicants to wait longer for those apartments designated to their ethnicity was still an intentional denial of housing "at least for a time." <u>Id.</u> at 1248.

The same rationale would apply where the group to be excluded is the

41

disabled community.  See, e.g., Cason v. Rochester Housing Authority, 748 F.Supp. 1002 (W.D. N.Y.  1990). As in Williamsburg Fair Housing, the BHA's adoption of a rule that causes the protected group to be passed over on the waiting list, ignoring the ordinary chronological order in which applicants would ordinarily receive housing, constitutes denial of housing under 42 U.S.C. Section 3604(f)(1), id. at 1245-48, inasmuch as it departs from federally required procedures.  Taken together, Williamsburg and Cason demonstrate that the act of passing over disabled applicants on the waiting list in favor of elderly and near elderly applicants violates 42 U.S.C. §3604(f)(2), by discriminating in the terms and conditions of rental to disabled applicants, even if some of the near elderly applicants are also disabled.   It is this act, and the resultant denial and delays in accessing housing, that the plaintiffs move this Court to enjoin.

C.    Plaintiffs Meet the Standard for Proving Intentional
      Discrimination.

1.      Impact of policies on plaintiffs

Rather than eliminating their discrimination against disabled applicants, the

42

defendants have created a new method of packaging their discriminatory policy. Permitting just disabled persons of a certain age range at Fireside will completely exclude the younger disabled group, while continuing to impact the disabled of any age by artificially constricting the number of units of elderly /disabled public housing units available to them, thereby continuing to delay their access to public housing.

### a.     Impact of exclusion from Fireside

The BHA's current admissions patterns have the same impact as its old policies. To date, no one disabled has ever been admitted to Fireside unless they could qualify as near elderly; only ten near elderly persons with disabilities - 36% of the Fireside offerees under Falco/Morales - received offers within the July 1, 2003-July 31, 2004 time frame, as opposed to eighteen (64%) elderly applicants. See Exhibit 39. Thus, even when offers to the near elderly who happen to have disabilities are viewed as offers to the disabled, instead of as offers to an expanded elderly category, which they, in reality, are, the Fireside pattern of offers during the past twelve months have not come close to granting equal access to the disabled.

The BHA was making 64% of its offers of Fireside units to the elderly even though

43

the elderly comprise just 35% of the total number of persons on a waiting list that includes only persons eligible for elderly/ disabled housing, when the gross undercounting of disabled applicants is factored in.  See Exhibits 32.  This imbalance continues the gross over representation of the elderly at Fireside as shown by Exhibit 27, in which 77% of the residents were offered Fireside as elderly applicants, and the remainder as near elderly persons.

To the extent the affidavits from the BHA's last two managers of the Resident Selection Office suggest a slightly fairer distribution of Fireside units, the appearance of fairness is merely cosmetic on three levels.

First, in the context of the BHA's historical inclusion of the near elderly along with the elderly, there is still not even one person admitted to Fireside solely on the basis of their eligibility as disabled persons, as shown by the fact that nobody under the age of 46 has *ever* been offered a unit at Fireside.  While the BHA staff now states that they understand that they must admit disabled persons of all ages, this cynical declaration has had absolutely no actual impact on persons whose sole claim to eligibility is that they are disabled.

Second, case law confirms that the impact of a policy must be evaluated based on whether the protected group receives a share of the housing that is proportionate to their

44

representation on the current waiting list. See, e.g., Langlois v.Abington Housing Authority, 234F.Supp. 33 (D. Mass. 2002). The elderly, as 154 out of 440 persons (estimated based on undercounting) on the current waiting list who would be eligible by law for elderly/ disabled housing, should receive only about 35% of that housing. If the BHA's elderly/ disabled housing was distributed proportionately, the proposed class members would have been the beneficiaries of the remaining 65% of the offers.

Third, Falco/Morales affidavits, which name only elderly and near elderly applicants, are not the product of a dearth of young disabled persons to whom to assign the units. As a matter of sheer logic, these two affidavits cannot represent the BHA functioning lawfully because they convey an age group cluster that could not have resulted by chance. *All* of the disabled applicants awarded Fireside within the eight month period covered by Ms. Morales' affidavit were between the ages of 50 and 61, a feat impossible to accomplish by chance. Williamsburgh Fair Housing Committee v. New York City Housing Authority, 493 F.Supp. 1225 (S.D.N.Y. 1980). Based on plaintiff's review of the electronic records kept by the housing authority, 48% of the disabled applicant pool on the current waiting list is composed of disabled persons under the age of 50; none appear on Ms. Morales' affidavit. Moreover, there is also no lack of young disabled applicants who have completed

45

the process and verified their full eligibility, based on the BHA's required landlord recommendations, credit checks, and criminal background checks.  Both Antonio Velez, 37, (see exhibit 18) and Awilda Rosado, 38, (exhibit 37),  had completed each of these steps and been deemed fully eligible, and were awaiting assignment throughout most of the period when Ms. Morales was in charge of assigning units.  Neither were offered Fireside, in spite of Ms. Rosado's obvious preference for the complex. See Exhibits 18 and 37. Chronological assignment of the units could not have produced this result, and therefore an inference of discriminatory intent is fully justified.

### b. Impact of delaying access to all public housing

By all measures, the BHA also continues to devote substantially less of its overall one-bedroom public housing units to the disabled than to the elderly.  The chart below breaks down the number of units offered to each type of applicant within the July 2003-July 2004 period:

46

| Eligibility | Fireside | Harborview | Marina | Scattered Sites | ALL 1 Bedroom |
|---|---|---|---|---|---|
| Elderly | 17 | 19 | 1 | 1 | 38 |
| Near Elderly Disabled | 10 | 14 | 3 | 1 | 28 |
| Disabled | 0 | 3 | 3 | 1 | 7 |
| Family | 0 | 0 | 5 | 2 | 7 |

This chart, using the "near elderly" 46-61 age category as set forth in the BHA's 2003 ACOP, shows that the younger disabled fare poorly for all available housing complexes. All groups of disabled are offered far fewer units than they should be, and fewer than the elderly even with the near elderly counted as disabled, based on their 36% share of the general waiting list population, as compared to 20% for the elderly.

Because the share of the housing offered to the proposed class has not improved overall, the delays experienced by this group in accessing housing could not be expected to have improved. Individual comparisons bear this expectation out, with Concepcion Colon, aged 50, waiting 5 months longer than Nora Gamble to be housed at Harborview, while Mary Beasley, aged 20, waited a year longer, even though both had applied at well before

47

her. See Exhibit 38. The cost of these policies, in human terms, is denial of housing for six months to a year–a terrible price to pay when the applicant must therefore remain homeless, as proposed intervenor John Nelson is at this moment.  Mr. Nelson contends with disabling symptoms related to the HIV virus while residing in the unfinished basement of his parents' home..  Delays of the  magnitude documented by the attached charts (exhibits 27, 34, 35, 36) are tantamount to denials of housing under the Fair Housing Act.  See Williamsburg Fair Housing Committee v. New York City Housing Authority, 493 F.Supp. 1225 (S.D.N.Y. 1980)..

### 2.    History and sequence of events behind current policies.

As discussed above, the historical backdrop for these near elderly and elderly only policies has been a stated desire on the part of the BHA administration to house primarily elderly tenants, and consequently avoid dealing with the needs of the disabled. The BHA under Falco/Morales has not demonstrated a will to do anything differently other than to hide this policy, rather than continuing to declare it openly.  Defendant Jonas DeGuzman and BHA counsel no longer openly admit to advocates for the disabled that Fireside is elderly only or that Fireside is designated as an elderly only project, as they once did.  Upon being questioned about future designation plans, defendant DeGuzman admitted at a public

48

hearing that it is only the fact that this litigation remains pending that has halted its elderly-only designation plans for 613 units, including all of Fireside and 232 of 240 units at Harborview. The continued practice of admitting near elderly to elderly/disabled housing and Mr. DeGuzman's statement about the BHA's designation plans clearly indicate that the BHA has not abandoned its intention to transform a significant portion of the BHA housing stock to elderly only housing though the need for disabled housing is much greater according to data cited by the BHA. Exhibit 25. These events suggest that the BHA does not intend to permanently comply, but rather to rid itself of this lawsuit and then return to its efforts to designate as much of its public housing as possible elderly-only. Thus, any changes are impermanent at best, and at worst will never actually be implemented. The BHA, for example, has never during the course of this lawsuit made any attempt to publicize the eligibility of persons with disabilities for Fireside. This failure to announce any change of policy to the disabled community shows the BHA's real reluctance to admit the disabled. And, it ensures that even though the BHA now admits in theory that the disabled enjoy the same rights as the elderly to Harborview and Fireside, the disabled population will probably never know it.

49

### 3.   Departures from normal procedures.

#### a.   Departure by delaying interviewing disabled applicants.

HUD requires housing authorities to state how they have chosen to organize their waiting lists. 42 U.S.C. Sec. 1437a.  The BHA's 2003 ACOP contains repeated statements indicating that the BHA has chosen the chronological method.  The BHA further promises that applications "will be maintained in order of date and time of receipt," elaborating that the object is "to ensure that families are placed in the proper order on the waiting list so that the offer of a unit is not delayed to any family unnecessarily or made to any family prematurely." See ACOP, chapter 4, Exhibit 11, at 44.  The comparatively greater length of time required to receive an offer as experienced by disabled, 37 years old applicant Willie Penix provides evidence of this problem.  Exhibit 18.

Because the interview schedule is entirely within the control of the Resident Selection staff, there is no way for applicants to know they have been passed over. Moreover, applicants cannot be the cause of the disparities because they have no impact at this stage. Being passed over at the start of the process greatly delays the applicants' access to public housing.

The defendants' staff have represented that they no longer depart from normal

50

methods of processing applications through devices like the Senior Appointment List. Nevertheless, pending applications from Willie Collazo and Jennifer Marichal, two persons who applied within four days of one another, demonstrate that it continues. Mr. Collazo was interviewed on April 17 of this year, yet Ms. Marichal was offered an interview over four months later, on August 3. The difference in ages again appears to be decisive, as the older candidate went first. While Mr. Collazo was not elderly, he does fall into the BHA's "near elderly" category. By interviewing Mr. Collazo out of order, the Resident Selection staff was violating the due process rights of younger disabled persons who had pre-applied before him. Historically, the BHA has been forced to cull the near elderly from the list in order to preserve the elderly character of the complex. Exhibit 19, Zennis Deposition, pp. 19-29, esp. 29; exhibit 23, Depostion testimony of defendant DeGuzman, see pp. 49-51, where DeGuzman admits that disabled persons are jumped over by elderly applicants when Fireside units are assigned. At present, this activity serves an additional purpose–it allows the BHA to manipulate the processing of applications, to expedite certain disabled candidates over others in answer to the charges of overall delay and exclusion made in this case.

51

b.    **Departures from chronological procedure for assigning units.**

Defendants' myriad departures from their ordinary methods for processing applications, particularly their failure to interview disabled applicants on the same schedule as elderly applicants, show their clear intent to discriminate. But the assignment process is the most egregious example of this failure to observe their own published procedures. As Exhibits 18, 37 and 38 demonstrate, the BHA routinely fails to house disabled applicants when there is any other elderly or near elderly applicant available. Exhibit 23, DeGuzman Deposition Testimony, pp. 49-51. Incredibly, this policy has been taken to such an extreme that able-bodied, employed 22 year old Maria Vasquez was housed in Harborview, *even though she is ineligible for elderly/disabled housing*, instead of at least two disabled applicants, Ms. Colon and Ms. Beasley, who were ready, waiting, and had a lawful right to be housed there when Vazquez was assigned an apartment. Exhibit 38.

Nevertheless, each of the three managers of the Resident Selection Office who have served since this lawsuit commenced - Zennis, Falco and Morales - claim that the controlling factor in deciding which applicant receives the next offer of public housing is chronology. See Exhibit 33, pp. 107-108,205-209. These individuals are willing to venture

52

such a claim that they are complying with the BHA's statutorily imposed duty to assign units chronologically because they know better than anybody that the BHA keeps no list of applicants who are fully eligible and waiting to be assigned and in fact does not even notify applicants when an eligibility determination is made. Since BHA officials keep no record whatsoever of who was waiting to be housed at what time, there is no record of where the BHA is on it's the waiting list, or who is at the top of the list on any given day. The crucial eligibility determination and assignment process is completely secretive and hidden from scrutiny - no paper trail is left behind. Only comparisons of individual applicants like those made in this memorandum, reveal something of the discriminatory process underway.

### 4.    Departures from substantive criteria.

As discussed in Sections B and D of the facts, *supra*, the BHA's decision to designate Fireside and other housing as elderly only without HUD's permission  was entirely divorced from the housing needs of the area it serves. Thus, its attempts to exclusively house the elderly and near elderly not only a circumvent the legal processes required by HUD, but they are discriminatory as evidenced by the clear fact  that they are prompted by a personal concern on the part of BHA officials for administrative convenience - a desire to make their jobs easier by managing the elderly rather than

53

indigent, mentally and physically disabled tenants.  Exhibit 21, number para. 3.

## II.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIM THAT THE DEFENDANTS' POLICIES AND PRACTICES HAVE AN ADVERSE DISPARATE EFFECT ON DISABLED APPLICANTS.

### A.  Standard for Disparate Effect

To make a case of disparate impact case, plaintiffs must show that a given practice has a greater impact on handicapped applicants than on non-handicapped ones.  Cason v. Rochester Housing Authority, 748 F.Supp. at 1007, citing Metropolitan Housing Development Corp. v.  Village of Arlington Heights, 558 F.2d 1283, 1288 (7th Cir. 1977), cert denied, 434 U.S. 1025 (1978).  Discriminatory effect is shown with proof that all person negatively affected by an allegedly unlawful practice are handicapped.  Cason v. Rochester Housing Authority, 748 F.Supp. at 1007.

The disparate impact theory is directed to facially neutral policies and practices that have a discriminatory effect.  To establish a prima facie case under this theory, the plaintiff must show (1) the existence of a facially neutral policy or practice and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts of practices.  Tsombandis v. West Haven Fire Department, 352 F.3d at 574-75.  Here,  the facially neutral policy would be imposing an age limit, such

54

as the BHA's fictitious 46-61 group, for elderly/disabled housing at Fireside.

A plaintiff must prove the challenged practice actually or predictably results in discrimination. There must be a causal connection between the neutral policy or practice and the alleged discriminatory effect. Id. at 575. Plaintiffs must identify members of a protected group that are affected by the policy and then identify similarly situated persons who are unaffected by the policy. Id. at 576. Disparate impact in a discrimination case can be measured by several tests. See, e.g., Langlois v. Abington Housing Authority, 234 F. Supp. 33, 57 (D. Mass. 2002). Two tests commonly employed in housing authority cases are the EEOC test, which reviews whether the protected group was selected at a rate at least four-fifths of the group with whom they are competing, and the Comer test, which looks at whether the protected group was selected for housing at a percentage rate at least equal to their presence on the waiting list. Id. at 56-58; Comer v. Cisneros, 37 F.3d 775 (2d Cir. 1994); Fudge v. City of Providence Fire Dept, 766 F.2d 650 (1st Cir. 1985)

> **B.    The Plaintiffs Have Demonstrated Disparate Effect, Because They Are Selected At a Rate of Only 11% As Compared to 25% For the Elderly.**

In Cason, the plaintiffs and proposed class challenged public housing eligibility criteria that required applicants to prove that they were capable of living independently, or

55

to live independently with minimal aid.  The court found that housing was denied only to handicapped applicants on the basis of an inability to live independently and that no non-handicapped persons were denied on the basis of this criteria.  In finding disparate impact, the court rejected defendants' argument that there was no discriminatory effect because only 17 of 276 handicapped applicants had been denied for their inability to live independently.  The court observed that the defendant Housing Authority improperly measured effect, which was proven by showing that the eligibility criteria had a greater effect on the handicapped, and that, in fact, only the handicapped were effected.  The court granted class certification for all 276 applicants since the plaintiffs complained about practices and procedures employed by defendants beyond the denial of 17 applicants.

In this case, where the resource at issue is elderly/disabled housing, the proper comparison is between (1) persons with disabilities seeking one bedroom units of public housing from the BHA, and (2) elderly people similarly seeking the same. This comparison "allows for a causal analysis between the claim of discrimination based on handicap and the facially neutral practice." See Tsombanidis v. West Haven Fire Department, 352 F.3d at 577. The claims of the applicants in Williamsburg provide an especially apt comparison because certain of the plaintiffs there, such as veterans, enjoyed federally created priority

56

rights to housing. The <u>Williamsburg</u> court affirmed that even *unintentionally* ignoring these priorities would create a discriminatory effect, <u>id.</u> at 1247. In the same way, ignoring the rights of disabled plaintiffs in this case to a preference for Fireside had a discriminatory effect on them.

The EEOC test can be employed prospectively to determine whether a potential disparate effect is substantial enough to warrant an inference of future discriminatory impact. One way to measure the potential effects in this case is to compare the percentage of disabled applicants who would have the opportunity to be assigned to the Fireside complex under the current policy because they are over 50 years old, versus the percentage of the disabled applicants who would have that opportunity absent the policy. One hundred percent of these disabled applicants would have an opportunity to be assigned to Fireside absent the defendants' "near-elderly only" policy, while just 52 % –the portion of the disabled applicant pool who are likely to be over 50–would be considered for Fireside with the new policy. Since 52% is less than four fifths of one hundred percent, the BHA's policy clearly disadvantages the disabled applicant pool to a disproportionate degree.

As to the BHA's overall record of actually offering disabled applicants public housing in senior/disabled complexes, it is appropriate to compare the selection rate for

57

disabled applicants to that of elderly applicants.  Using the July 27, 2004 waiting list as a basis, attached as Exhibit 39, there are 440 persons out of the 783 total who may be eligible for elderly/ disabled housing: 154  elderly and approximately 286 disabled.[5]  It is therefore possible to determine the percentage rate at which the elderly applicants were selected for elderly/ disabled housing versus the percentage rate at which disabled applicants were selected, the following calculations.  During the Falco/Morales tenure at the Resident Selection office, and with near elderly persons with disabilities counted as "disabled" even though the historical context of their offers indicate that their status as "near elderly" was the determinative factor, the recent offers show a bias in favor of the elderly and against the disabled:

ELDERLY: The BHA gave offers to 38 elderly applicants, which represents 25% of the 154 persons on the July, 2004 wait list.

---

[5]  As described above, the number of persons recorded by the BHA on the July 27, 2004 list as disabled is 179.  However, due to the administrative failure to record 6 out of 10 of the pre-applications that indicate disability, as shown on Exhibit 31, this figure is likely to underestimate the number of disabled applicants by 60%.  There are also an unknown number of disabled applicants who are undercounted because their claims for Social Security disability benefits, the only indicator of disability known to a BHA employee despite the more expansive legal definition of disabled, are not yet adjudicated.  Therefore, for purposes of the above calculations, plaintiffs estimate that the true number of disabled applicants approximately 286, or 60% higher than the 179 figure.

DISABLED: The BHA gave offers to 32 disabled applicants out of 286 on the list, for a rate of 11%.

The results under the Comer test are equally clear: the disabled, who form 68% of the waiting list for elderly/ disabled housing, were selected for only 45% of the offers during the past twelve months.

## III.   RELIEF REQUESTED WILL NOT HARM THE DEFENDANTS

The defendants as a municipal agency and its managerial staff, are charged with lawfully administering subsidized housing.  In light of this responsibility, it is in their interest to comply with the law.  As none of the relief requested goes beyond restoration of lawful order to the BHA's current, chaotic system for assignment of public housing, the defendants will be assisted by the requested injunction.  Thus, requiring the BHA to adhere to the well-established procedures set forth by HUD, including those in its own ACOP, will not harm the defendants.

## IV.   THE PUBLIC HAS A STRONG INTEREST IN FAIR ADMINISTRATION OF ESSENTIAL PUBLIC BENEFITS SUCH AS PUBLIC HOUSING

Plaintiffs request that the Court waive the posting of a bond, based on the

59

indigency of the named plaintiffs and of the vast majority of the proposed plaintiff class, and the strong public interest in fair administration of subsistence benefits.

## CONCLUSION

Prior to this lawsuit, the BHA routinely represented to the Bridgeport public that its Fireside complex was for "seniors" 62 years of age and over, but that if the complex had vacancies, it would also admit "pre-senior" persons over the age of 46 or, at times, 55, as a last resort. See DeGuzman Depo., Exhibit 23. The BHA stated in Affidavits submitted to this Court that it acknowledges its responsibility to admit disabled applicants to Fireside on an equal basis with the elderly. Yet neither Falco nor Morales have offered a *single* unit at Fireside to any disabled applicant under the BHA's fictitious and illegal "near elderly" age of 46. The pattern of offering housing to the elderly before the disabled has persisted, despite the fact that plenty of appropriate candidates existed. Injunctive relief is necessary.

60

Respectfully submitted,

THE PLAINTIFFS

By _____
Jennifer Vickery (CT24089)
1115 Main Street, Suite 415
Bridgeport, CT 06604
Tel.(203) 384-1245
Fax. (203) 384-1246
Email: alanrosner@aol.com

## CERTIFICATION

This is to certify that a copy of the foregoing has been delivered by overnight courier mail service on this 4th day of October, 2004 to:

Michael Ryan and James Mahar
Ryan, Ryan, Johnson & Deluca, LLP
80 Fourth Street, P.O. Box 3057
Stamford, CT 06905-3057


_____
Commissioner of Superior Court