UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| THOMAS MATYASOVSZKY, ET AL. | : | |
|            Plaintiffs, | : | CIVIL ACTION NO. |
| | : | |
| v. | : | 3:03 CV 968 (WIG) |
| | : | |
| HOUSING AUTHORITY OF THE CITY | : | |
| OF BRIDGEPORT, ET AL | : | JUNE 12, 2008 |
|            Defendants. | : | |

**AFFIDAVIT OF ALAN ROSNER**

Alan Rosner, being duly sworn, deposes and says:

    1. I am a solo practitioner and co-class counsel with Attorney Lori Welch-Rubin for the plaintiff-class in the above captioned case.

    2. I submit this affidavit in opposition to Attorney Vickery's Motion to Modify Order regarding fees and costs. Attorney Vickery's demand for nearly one third of the funds reserved for attorney fees under the Consent Decree (a) overstates the number of hours she actually worked; (b) in part, seeks fees for a time period during which she received a weekly payment for all work she performed; ( c) unfairly seeks attorney fees for many hours during which she performed non-attorney functions, and at an hourly rate computed by Attorney Vickery that she assumes will be equal to that paid to the current,

1

more experienced class counsel to finish this case; (d) seeks payment for unnecessary work; and (e) seeks a disproportionate share of the $300,000.00 set aside for fees under the consent decree for work allegedly performed over a period of 21 months in a case that will not be completed until at least eight years from its commencement and perhaps longer.  Any fee  awarded  to Attorney Vickery should be reduced by advances on her share of fees paid to her by the undersigned from October, 2003 through February, 2005.  The facts regarding these advances and other issues are misstated in Attorney Vickery's motion and supporting, unsworn "affidavit" dated February 10, 2008.

Background

    3.  On or about May 22, 2003, I hired Attorney Vickery to work as an attorney in my office.  I agreed to pay her a weekly salary and deducted taxes from her checks.   In or about the last week of August, 2003, I informed Attorney Vickery that I would not continue the employment relationship effective on or about October 8, 2003.   On or about October 8, 2003, it was agreed by Attorney Vickery and me that her tenure at my office would be regarded as that of an independent contractor, and not as an employee, and that she would pay her own taxes on monies paid her.

    4.  Attorney Vickery was paid a total of $15,205.10 from May 22, 2003 through

October 8, 2003 as follows:

| Date     | Amount Paid |
|----------|-------------|
| 5-29-03  | 706.12      |
| 6-6-03   | 711.77      |
| 6-13-03  | 711.77      |
| 6-20-03  | 711.77      |
| 6-26-03  | 711.77      |
| 7-7-03   | 711.77      |
| 7-14-03  | 711.77      |
| 7-18-03  | 711.77      |
| 7-29-03  | 711.77      |
| 8-5-03   | 1684.54     |
| 8-19-03  | 1422.54     |
| 8-22-03  | 1422.54     |
| 8-28-03  | 711.77      |
| 9-5-03   | 1422.00     |
| 9-19-03  | 711.77      |
| 9-27-03  | 711.77      |
| 10-8-03  | 711.77      |

Total: $15,205.10

Checks are attached hereto as exhibit A, except for 6-26-03, 7-29-03, 9-19-03, 9-27-03, and 10-8-03. These dates are recorded in my office ledger as having been paid to Ms. Vickery but the bank statements and canceled checks are not available to me at this time. During this period of time, Attorney Vickery was asked to work on a number of cases, including Matyasovszky. She now claims Matyasovszky fees for work performed

3

during this period. She also mistakenly claims that these payments were made in 2004 for her services on other cases I was handling at that time. Unsworn Vickery Affidavit, para. 2. The facts regarding other cases she continued to be involved with after October 8, 2003 are set forth below.

     5. Upon information and belief, Ms. Vickery had not secured other employment by October 8, 2003. At her request, I agreed to have Attorney Vickery work on two other cases. Ms. Vickery performed some work on the case of <u>Manning-Jones v. Beazley Co. Realtors</u>, 3:03 CV 1473 (SRU) during the term of her employment. See Vickery aff., para. 2. After October 8, 2003, I agreed to pay Ms. Vickery a portion of any fee recovered - the amount I cannot remember - in exchange for Ms. Vickery's assistance. However, her involvement with this case was short-lived. Attorney Vickery's relation to opposing counsel was difficult. Following a deposition conducted by Attorney Vickery, I was contacted by opposing counsel about her conduct during a deposition she defended; a threat of sanctions was made. Shortly thereafter, Attorney Vickery voluntarily withdrew from any further involvement in the case and voluntarily agreed to forego any payment from the proceeds of the case when it settled.

     6. I also consented to have Attorney Vickery continue her work on one CHRO

housing discrimination case after her formal relation to my office ended.  In or about November, 2003, the client asked me to handle the case exclusively and Attorney Vickery did not perform any further work on the case.  In or about January, 2004, the case was settled; by check dated January 27, 2004 Ms. Vickery was paid one-half the $5000.00 fee, or $2500.00.  Exh. B, check for $2500.00 in Luna case.

      7. Attorney Vickery also edited, revised and updated a trial brief that I had written, for submission to the Appeals Court in Fleming v. City of Bridgeport, 92 Conn.App. 400 (2005).   Attorney Vickery was paid a fee of $750.00 for this work.  Exh. B.

Attorney Vickery's Post Employment Involvement with Matyasovszky

      8. In or about October, 2003, Attorney Vickery proposed that she continue to assist me in the prosecution of Matyasvoszky, which had been filed shortly before Ms. Vickery was hired in late May, 2003.  Ms. Vickery proposed that we share the fees at the conclusion of the action.  I agreed.  The stated assumption was that the equal sharing of fees would hold even if Attorney Vickery worked more hours than the undersigned; the benefit to me, according to Attorney Vickery, was that I could delegate the less difficult tasks and supervise the more difficult ones.  This assumption was based on Attorney

5

Vickery's employment record; her relative lack of experience as an attorney generally and as a litigator specifically; and upon the undersigned's payment of all costs of the litigation and all costs related to the operation of an office, including the costs of Attorney Vickery's cell phone.  The costs, excluding costs related to cell phones and office overhead, amounted to over $20,113.18; I have recently reimbursed myself for this amount over Attorney Vickery's objection.

    9.  From October, 2003, through March, 2005, Attorney Vickery asked me for, and received advances on the fees that were anticipated in the Matyasovszky case.  During this period, I advanced Ms. Vickery from my personal funds a total of $20,440.00.  Canceled checks documenting most of this sum are attached hereto as exhibit "C."  Two checks are missing: advances of $300.00 made on October 22, 2003 (check # 2758), and of $2500.00 made on November 5, 2003 (check # 2779).  Copies of these two checks will be requested from the bank if this amount is challenged.  An email from the undersigned to Attorney Vickery documenting advances in Matyasovszky, and her response acknowledging advances, is attached hereto as exhibit "D."  The list of advances contained in the email is incomplete, as the checks attached hereto as exhibit C make clear, and mistakenly includes the January 27, 2004 fee payment made to Attorney

6

Vickery in the Luna case, as discussed above. However, Attorney Vickery acknowledged in her 4-13-05 email response that there were other advances made to her that were not reflected in my correspondence.

    10. To date, Attorney Vickery is the only plaintiffs' attorney who has been compensated for work in the Matyasovszky case.

Attorney Vickery Has Overstated the Number of Hours She Worked

    11. While Attorney Vickery claims that she prepared attorney fee time records at my request in July, 2005 for an eventual fee motion (Vickery aff., para. 3), in fact, she prepared time sheets in February, 2005 for purposes of making a demand/proposal for fees in settlement negotiations held that month. Attorney Vickery presented her time sheets to me very late the evening before the settlement conference. I reviewed her time sheets for only a minute or two, given the late hour; I reviewed the first page of entries and saw she had claimed hours of work for a time period when Attorney Vickery could not have worked on the case. I asked her to correct the error and handed back the time records. I urged her to review her time sheets since I was not able to review the other pages of her submission prior to the settlement conference the next day. The entire first page of the Vickery time sheets that I reviewed in February, 2005 is no longer included as

part of the time records she has submitted to this Court in support of her motion.

    12.  Such an error in her first submission suggests that entries in her time records were based on memory, and not contemporaneous records, and, therefore, are not a reliable statement of work she performed.

<u>Attorney Vickery Seeks Fees at an Excessive Rate and for Non-Attorney Work At Attorney Rates</u>

    13.  Many of the hours claimed by Attorney Vickery in her records are for work typically performed by non-lawyers.  For example, many of the entries reflect time she spent entering data into an Excel format so that the age, category (elderly or disabled), and time spent on the BHA waiting list by tenants seeking one bedroom BHA units, could be presented in chart form.  Attorney Vickery spent a significant amount of her time reviewing BHA resident files onsite to obtain reliable data about the age and disability status of BHA housing complexes.   Theses tasks could have been and were performed, at various times, by non-lawyers in my employ.  Attorney Vickery also performed these tasks to justify the agreement to share the fees with an inexperienced attorney.   It was not contemplated that Attorney Vickery would be paid for these less difficult, non-attorney tasks at an attorneys' hourly rate after she voluntarily withdrew as class.

8

14. Nonetheless, Attorney Vickery implicitly argues that she is entitled to the same hourly rate as Attorney Welch-Rubin and the undersigned. Her argument makes the unwarranted assumption that an hourly rate can even be computed in light of the considerable but unknown amount of work remaining to be performed in the months and years to come. Her claim is also based on her allegation that she was forced to withdraw from the case; though Attorney Vickery, in her motion papers, speaks of vindicating her 50% ownership interest in fees, she actually is seeking to forego any 50-50 sharing of fees by virtue of my alleged breach of our agreement, and prefers instead payment for alleged hours of work at an arbitrary hourly rate. The breach is said to lie in my failure to apprise her of a settlement offer made in late May, 2005, and that my refusal to provide her with access to the file. (Vickery aff., para. 3). She does not mention that she withdrew to accept a position with Connecticut Voices for Children as stated in her motion. In any case, her claims about access to the files and notice of a settlement offer are false.

15. Attorney Vickery asserts that she was not informed of an offer regarding attorneys' fees and costs made by defendants at a settlement conference in late May, 2005. However, several days prior to the filing of her motion to withdraw, by an email dealing with various subjects and dated June 1, 2005, Attorney Vickery was specifically

9

informed of an offer made by defendants of $100,000.00 for a client fund, $48,000.00 for the named plaintiffs, and $150,000.00 for costs and fees through notice, finalization and approval of the consent decree.

16. Regarding access to the plaintiff file, in fact, Attorney Vickery had full access to the file throughout her involvement in the case. She was never denied access to any part of the file. In the spring of 2005, Attorney Vickery, unhappy with the pace of negotiations, and with a view toward preparing a summary judgment motion in the case, requested from me and obtained permission to take the entire file - approximately 20 boxes of documents - to her home to use in preparing a motion. She held the file for approximately one month. When it appeared that Attorney Vickery had not made any progress in drafting a summary judgment motion, I requested that she return the file to my custody.

17. The file was returned to me in a manner that did not ensure its safety. Additionally, the files, previously organized and easy to work with, were completely disorganized, as if the documents had been shuffled. Upon restoring order to the file, it was discovered that deposition transcripts were missing and other documents could not be located. The boxes also included a case file completely unrelated to Matyasovszky; the

state judicial website shows this case to have been one handled by Attorney Vickery. Attorney Vickery rejected a request to retrieve the file. Shortly after Attorney Vickery returned the <u>Matyasovszky</u> file to my custody, she filed her motion to withdraw.

18. Thus, there is no factual basis for the claim that she was forced to withdraw as class counsel, and, thus, for her implied argument that she should be paid by the hour at the same hourly rate she assigns to more experienced attorneys for all work, including non-attorney work, and, as discussed below, unnecessary work.

<u>Certain Work Performed by Attorney Vickery Was Did Not Advance the Case</u>

19. In order to maintain the class counsel relationship, I did not prevent Attorney Vickery from performing certain work, insisted upon by Attorney Vickery, that could not have advanced the cause of the plaintiff class, and has proven to be unnecessary to the prosecution of this case. In this regard, the hours claimed by Attorney Vickery to commence a second action and motion for a temporary restraining order on behalf of Judith Montes, and any work performed to draft a summary judgment motion once settlement negotiations had begun, was not necessary or a prudent use of resources and should not be compensated for.

20. Certain work during was performed by the undersigned during Attorney

11

Vickery's tenure which could not properly be included in the undersigned's time records, including hours of supervision of Attorney Vickery in preparation for depositions and other tasks.

21. Also included in this category was work performed to prepare a preliminary injunction motion. In or about August and September, 2004, I had drafted the memorandum in support of a motion for preliminary injunctive relief. In or about September, 2004, Attorney Vickery proposed to edit and revise the memorandum. Instead, Attorney Vickery deleted the entire memorandum from the hard drive of my computer, without creating a back-up file, and began drafting her own version of the memorandum. Attorney Vickery's short beginnings of a draft were not a coherent statement of the facts of the case. I was forced to spend many hours re-creating the memorandum I had previously drafted which are not accounted for in my time records.

<u>Amount and Scope of Work Performed and to be Performed</u>

22. Attorney Vickery withdrew from this action three years ago, at the early stages of settlement negotiations. None of the difficult issues on the path to a settlement decree had been resolved at that time. The number of hours set forth in the Motion for Fees heard at the fairness hearing were merely low estimates of the number of hours spent

during the negotiations and expected to be spent implementing the Consent Decree – numbers more than sufficient to justify the capped sum of money set aside for fees and costs in the Decree. The amount of the fee Attorney Vickery has demanded in her motion is out of proportion to the work performed, and completely unwarranted in light of the work already performed to finally settle this matter.

23. Even now, we know that the estimates for hours in the Motion for Fees greatly underestimates the number of hours necessary to implement the Decree. There have been significant, unforeseen difficulties in having the BHA serve notice on all class members. Over 1500 notices initially served were returned undelivered. It took nearly two and one half months to push the BHA to perform NOCA database searches for current addresses for potential class members. In the end, the BHA's searches were incredibly unproductive; only about 50 addresses for people on the BHA lists to get notice were identified.

24. The undersigned has spent many hours searching for individuals at local health and social services agencies who are potential class members. I have performed trainings about class members' rights under the consent decree at the Bridgeport Community Health Center, Family Services Woodfield, Bridge House, the Bridgeport

13

Mental Health Center and other agencies in the hope of locating class members. I have reviewed lists of names of potential class members with clinicians, social workers and counselors to identify their clients/patients on the lists and provide them with notice of the consent decree and a claims form.

    25. The undersigned has also spent considerable time negotiating with the Department of Social Services on an arrangement whereby DSS works with the BHA to serve notice of settlement upon DSS clients who are on the list of 1500 people who have not yet received actual notice. Since most disabled people receive some form of assistance from DSS, even when they are also receiving disability benefits from the Social Security Administration, it was surmised that DSS would have a valid address for these individuals. This surmise has proven to be accurate. To date, DSS has found valid, current addresses for 889 people from BHA lists of potential class members totaling 1140 names. The result has been a flood of calls and visitors to my office and to that of Attorney Welch-Rubin, as occurred in the weeks after the BHA made their first service of notice in or about late January, 2008. However, because of delays occasioned by personnel changes at the BHA and related difficulties in providing DSS with lists of names, the work of providing notice and allowing all potential class members a sufficient

period of time to file claims will not be completed by the current deadline of July 18, 2008. Plaintiffs anticipate that it will be necessary to file a motion for an additional extension.

26. The undersigned, together with the claims administrator, have already reviewed many of the claims forms submitted in the prior five months. It is clear from randomly reviewing certain questions on the forms with claimants that every single question on every single claims form will have to be reviewed for accuracy and the understanding of the claimants. This is true because the form is difficult to read and because the claimants are unfamiliar with such proceedings. Additionally, many of the claimants are unable to read such documents for understanding; each provision will have to be explained to ensure that claimants understand what they are doing. Since most claimants cannot remember when they applied for BHA housing, my office will need to contact BHA's disability coordinator, Blanca Carrasquillo, to learn the dates of applications for each claim and to ensure that each potential claimant made a housing application during the relevant time period. Difficult legal issues will also arise: for example, the need to assist relatives of deceased class members who cannot afford to open an estate in probate court but where, nonetheless, a strong claim for an award exists.

The need to advise recipients of awards about their obligations to notify benefits programs they are currently participating in after they receive their award will take countless hours and considerable patience, given the complexity of the benefits programs involved. These and many other issues, known and to be discovered, guarantee that counsel will be performing far more work than anyone even remotely anticipated would be necessary when Attorney Vickery withdrew, or even when approval of the consent decree was sought in December, 2007.

27. Counsel for plaintiffs have also advocated on behalf of the named plaintiffs at the Connecticut Departments of Social Services and Administrative Services to ensure that new provisions of law (contained in CGS Sec. 17b-93) exempting housing discrimination damages from state liens are honored.

28. It is also clear that processing claims for awards is going to be an extremely time consuming project. Many of the potential claimants appearing at my office on a daily basis, without advance notice, are disabled by mental impairments. Most of this population is either unable to read or unable to focus and concentrate. Each and every paragraph has to be read and explained to them; they need assistance to answer each question posed on the claim form. It is grueling, demanding and time consuming work

that was not anticipated even as recently as the time of filing for the Motion for Fees. Though a settlement administrator performs a considerable amount of this work, there is simply too much client service needed for her to perform all the work under the limited resources made available for her services.

29. I have worked on this case virtually every single business day since the first notices of settlement were delivered in January, 2008. It appears that this will continue to be the case through the completion of the filing of claims, and the granting and rejecting of claims, which, hopefully, will occur this autumn, with the motion practice and application for court approval to follow, as required by the decree.

30. By the time monitoring of BHA compliance with its various obligations under the decree is completed, including reaching the ratio of establishing a population at Fireside Apartments that is 2 to 1, disabled to elderly, it is likely that this case will have been pending for at least eight years. In this context, Attorney Vickery's demand for fees is exorbitant and, if granted, will ensure what will probably be the case in any event: that remaining class counsel will complete this case at an hourly rate that is considerably lower than the rate Attorney Vickery would pay herself.

Dated: Bridgeport, CT
      June 12, 2008

                        /s/_____
                        Alan Rosner

Sworn to before me this 12th day of June, 2008.

                        /s/_____
                        Lori Welch-Rubin, Commissioner of
                        Superior Court

Certification

_____I hereby certify that on June 12, 2008, a copy of the foregoing Affidavit was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by email to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

/s/_____
Alan Rosner