UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| THOMAS MATYASOVSZKY, ET AL | : | CIVIL ACTION NO. |
| Plaintiffs, | : | |
| | : | 3:03-CV-968 (WIG) |
| v. | : | |
| | : | |
| HOUSING AUTHORITY OF THE CITY | : | |
| OF BRIDGEPORT, ET AL, | : | September 24, 2004 |
| Defendants. | : | |

## MEMORANDUM IN SUPPORT OF
## PLAINTIFF'S MOTION

### STATEMENT OF THE CASE

The plaintiffs seek this preliminary injunction to access their fair share of two

public housing complexes administered by the Housing Authority of the City of

Bridgeport ("BHA"). Since 1961, the Fireside Apartments and Harborview

Towers were supposed to house *both* elderly and disabled tenants. Instead, the

BHA has unlawfully operated Fireside as an elderly only complex, and

Harborview as a family complex. By pretending to have obtained the approval

necessary from the U.S. Department of Housing and Urban Development ("HUD")

to devote Fireside to the elderly, the BHA escaped its legal responsibility to locate

other suitable housing for the disabled group. Thus, without ever formally seeking

designation of Fireside as an "elderly only" project, the BHA nonetheless

excercised all of the privileges granted by the designation statute, 42 U.S.C.

§1437e, including the rule permitting occupancy by "near elderly" tenants when there are insufficient elderly applicants to fill vacant apartments.  Consistent with this abdication of its responsibilities to the disabled population of Bridgeport, the BHA also gave apartments at Harborview--the BHA's only other elderly/disabled complex--to able-bodied, non-elderly adults.  Both actions violated the rights of disabled applicants and candidates for transfer by denying them much-needed housing intended for their use.

 In an attempt to create for the Court the appearance of compliance with fair housing laws, the BHA over the past twelve months has combed the waiting list to admit the same number of "near elderly" disabled applicants as elderly applicants to Fireside.  This kind of "cherry picking" of tenants, selecting only those few disabled applicants deemed acceptable, preserves the elderly character of Fireside yet continues to violate the rights of all disabled applicants, even those like named plaintiff Linda Dedrick who are in the "near elderly" category.  Because under the near elderly rule, disabled tenants are admitted only after all eligible elderly applicants have been housed,  number admitted to Fireside is guaranteed to remain well below what it would be if the waiting list was operated in a way that did not discriminate against any disabled applicant.  The policy is also guaranteed to not only exclude *all* class members under the 46 year old age limit set by the BHA, like proposed intervenors Kenneth Gihon and John Nelson, Jr., but also to continue subjecting all near-elderly disabled applicants who were not hand-picked for

Fireside to months of additional time on the waiting list, in violation of the fair housing laws. And finally, the policy cynically violates the due process clause of the U.S. Constitution by failing to adhere to the most basic tenet of their own policy manual–the duty to assign public housing in chronological order.

For these reasons, the plaintiffs, on behalf of themselves and the proposed class, move for a preliminary injunction enjoining the illegal operation of Fireside as an elderly only project, requiring that Harborview be operated as an elderly/disabled housing, and enjoining the use of age restrictions by the defendants when determining whether a person with disabilities is eligible for elderly/disabled housing. As further explained below, plaintiffs seek nothing more than what well-established federal law already requires of every housing authority.

## SPECIFIC RELIEF REQUESTED

To halt the defendant BHA's ongoing discrimination against persons with disabilities, plaintiffs respectfully request that this Court enter an order enjoining defendants to:

(A) eliminate the use of age restrictions when determining whether persons with disabilities are eligible for housing at Fireside;

(B) stop assigning persons who are neither elderly nor disabled to elderly/disabled housing, including but not limited to Fireside and Harborview;

(B) provide written notice, in a form to be approved by the Court, to all BHA employees at the Resident Selection office, and at the BHA's executive offices and site management offices, that persons with disabilities, regardless of their age, are eligible and entitled to a preference for Fireside or Harborview on an equal basis with the elderly, and requiring such employees to communicate the same to BHA tenants seeking transfer, prospective applicants for BHA housing, and interested members of the general public.

(C) employ the "Pre-Application" form attached to the HUD Guidebook for Public Housing to identify persons who may be eligible for elderly/disabled housing;

(D) provide written notice to each applicant on the current general population waiting list, and each current BHA tenant, informing them of the definition of "disabled person" for purposes of public housing eligibility, and of how disabled persons may demonstrate eligibility for a housing preference for elderly/disabled housing;

(E) modify the BHA's Tenant Preference form, whereon prospective tenants state their preferences for particular BHA housing complexes, to identify all elderly/disabled housing complexes for which persons with disabilities may be eligible;

(F) provide written notice to all BHA tenants currently occupying one bedroom or studio apartments stating that the BHA discriminated against persons with

disabilities at the time they were assigned a unit, and stating that such tenants may be eligible to transfer to Fireside, Harborview or any other elderly/disabled public housing complex owned by the BHA and identified in the notice.

(G) make available "tenant transfer request" forms and a written copy of the rules or policies governing tenant transfer requests to all interested disabled tenants, and ensure that such submitted forms shall be date and time stamped and that the tenant's name be placed on the current waiting list chronologically in accordance with the stamped date and time;

(H) provide notice, in a form and in a manner to be approved by the court, of the eligibility of disabled persons for Fireside and Harborview to all persons who applied for public housing prior to the implementation of a preliminary injunction in this case, or who inquired about applying, and to governmental agencies and non-profit organizations in the State of Connecticut providing advocacy or support for disabilities.

(I) process all applications submitted by disabled persons using the same procedures as are used for applications submitted by elderly persons;

(J) produce and maintain an elderly/disabled complex waiting list ("E/D List"), showing the chronological order in which all disabled and elderly applicants who are still on the waiting list should be offered housing, and promptly adding new applicants and transfer requests from disabled and elderly applicants immediately upon receipt;

(K) offer each unit at Fireside that becomes available in the future to the next

eligible disabled applicant on the E/D List, in chronological order, until such time

as the percentage of disabled tenants residing there is equal to or greater than the

percentage of disabled applicants on the waiting list for elderly/disabled

complexes.

## FACTS
**A.     Facts Regarding the BHA's Elderly/Disabled Housing Stock.**

Since 1961, the federal government has subsidized the building and operation of

public housing complexes intended solely for elderly and disabled persons

("elderly/disabled housing").  The BHA administers two such complexes,

Harborview Towers and Fireside Apartments.  Fireside consists of 248 ground-

level apartments surrounded by grass, trees, pathways and benches and the

complex as is located in a residential area.  Each unit has a garden area and an

outdoor clothesline.  Harborview consists of 240 units located in three high-rise

buildings serviced by elevators.  The cinder block interiors of the units preclude

the hanging of pictures or draperies.  The Harborview complex is bordered on one

side by a train yard, and on another by a heavily trafficked street.  The ground

level view is of a series of boarded up buildings.

Although the statutes, terminology and sources of funding for these complexes

have changed over the decades, federal law has always required the admission of

disabled people to any floor or building built for the elderly.[1]  24 C.F.R. §960.407(a); see Review of Designated Housing Plans: A HUD Guidebook, August 1998, at 3 (Exhibit 1); see also Public Housing: Impact of Designated Public Housing on Persons with Disabilities, GAO/RCED-98-160, 6-9-98, at 3. In accord with this obligation, the Department of Housing and Urban Development ("HUD"), requires housing authorities not only to inform the disabled of their eligibility, but also to "give applicants an opportunity to show that they qualify for" elderly/disabled housing.  24 C.F.R. § 960.206(a)(4).

 With the passage of the Housing and Community Development Act of 1992, Congress gave public housing authorities the option of designating mixed population projects as "elderly only" or "disabled only," *provided* that they first obtained HUD's approval of a designation plan meeting specifications stated in the Housing Opportunity Program Extension Act, see 42 U.S.C. §1437e (a)(1) and (d), including a description of the additional resources or housing assistance that the housing authority will provide to the excluded group.  See PIH Notice 97-12 (Exhibit 2).

 All parties agree that, to date, the BHA has neither filed for nor received HUD's approval to designate Fireside as elderly only.  See Amended Answer, at ¶17.  As

---

[1]      Terms for this housing have included "senior" and "elderly" projects, as HUD then defined those terms to include disabled persons. See, e.g., 24 C.F.R. §880.202(c) (withdrawn). HUD's current term for elderly/disabled housing  is "mixed population" housing. 24 C.F.R. §912.2.

of September 2003 the BHA had announced to HUD its plans to submit formal

elderly only designation requests for 613 units.  However, Defendant Jonas

DeGuzman announced at an August 2004 public hearing that it was temporarily

withdrawing these plans from HUD's consideration because of the pendency of

this lawsuit.

**B.      Facts Regarding the BHA's Public Representations that Fireside Was
          Designated Elderly Only.**

   Until the filing of this lawsuit, BHA officials were never secretive about their

desire to eliminate disabled people from all of their complexes.  By 1999, BHA

officials and representatives had already expressed their intention to operate

Fireside as an elderly complex over dissenting voices of advocates for the disabled.

A number of advocates explained to the defendants the legal requirement of

permission from HUD to designate a complex as elderly only.  The defendants

refuted these attempts to remind them of their obligation to give equal access

housing at Fireside by stating that Fireside had been designated elderly only.  Even

the BHA's legal counsel, Joseph Siciliano, expressed his belief that Fireside was

lawfully operated as an elderly only complex.  On September 2, 1999, he rejected

an inquiry by a Connecticut Legal Services attorney representing a non-elderly,

mobility impaired tenant expressing a desire to be housed at  Fireside by stating:

"As you have been advised, Fireside Apartments is a designated senior citizen

complex and cannot be made available to Ms. Williams." See Letter from Attorney

Siciliano dated  September 2, 1999 (Exhibit 3).  When the Legal Services attorney responded that Fireside has never been approved by HUD as an elderly only project, and, thus, that no legal impediment prevented a referral of his client to Fireside, Attorney Sicialiano remained silent on the topic of designation, and the BHA referred Ms. Williams to a project other than Fireside.  See Griffin letter dated September 23, 1999 (Exhibit 4), and Siciliano letter dated September 30, 1999 (Exhibit 5).

 When the City of Bridgeport's Housing Authority Fair Housing Officer, Joseph Wincze, learned of the claims made by Attorney Siciliano, he too wrote to BHA counsel explaining that exclusion of the disabled from Fireside was illegal, and the need for permission from HUD to designate a complex as elderly only. See Wincze letter dated October 19, 1999 (Exhibit 6). Neither Attorney Siciliano nor any other BHA representative responded to Mr. Wincze' October 19, 1999 letter, or to his follow up phone call.  See Wincze Aff. (Exhibit 7).

 The BHA continued to publicly state that Fireside was "elderly only" even after plaintiff Matyasovzsky, one of the many prospective applicants who had been told he was ineligible for Fireside based on his disabled status, filed a claim of discrimination with the Connecticut Commission on Human Rights and Opportunities ("CHRO") in early December, 2002.  On or about January 2, 2003, in papers opposing Matyasovszky's claim for relief, defendantDeGuzman explained the BHA's position that the"Fireside Apartments were limited to elderly

only residents but we would not deny disabled applicants." (Exhibit 8).

DeGuzman further clarified this somewhat ambiguous statement in March,

2003,when he told the Housing Litigation Director for Connecticut Legal Services

that the BHA was informally operating the Fireside and Harborview complexes as

elderly only. See Tenenbaum Aff. (Exhibit 9).

 In its defense of this proceeding, the defendants have taken the position that the

BHA never operated Fireside as a *de facto* designated elderly project,

notwithstanding their statements recited above.

**C.      Facts Regarding the BHA's Implementation of the "Elderly Only"
         Policy at Fireside.**

 The defendants implemented their oft-stated policy to exclude the disabled from

Fireside by continuing to pretend to applicants that designation had already

occurred, and continuing to follow the policies set forth in a section on "Units

Designated for the Elderly" in its manual, see ACOP, chapters 3 and 4 (Exhibit

10), even after the manual failed to win HUD's approval.  See Minutes of ___

(Exhibit 11).

**1.      The BHA Misled the Disabled By Stating That They Were Ineligible
         for Fireside.**

 BHA officials and employees, and particularly employees at the Resident

Selection office, who have the greatest amount of contact with potential applicants,

have consistently told disabled potential applicants that Fireside is only for the

elderly.   While some disabled persons over the years successfully obtained assistance[2] to force the BHA to respect their rights to seek housing at Fireside, the BHA's elderly only plan proceeded largely unimpeded, as evidenced by the age of the current population, discussed below.

 The named plaintiffs were each told by BHA employees that, as disabled persons under the age of 62, they were simply not eligible for housing at Fireside.  In October of 2000, when plaintiffs Sandra and Joseph Pellechio were interviewed for public housing, they asked to be assigned a Fireside apartment.  At 50 and 51 respectively, they were told that they were not old enough to be assigned to Fireside, and that disabled applicants were limited to Harborview Towers and Trumbull Towers.  They were assigned to Harborview shortly thereafter.  See Complaint in Intervention of Sandra and Joseph Pellechio, dated December 30, 2003, at ¶ 24.   Similarly, when lead paintiff Thomas Matyasovszky contacted BHA offices in 2002, he too was falsely told that only elderly people can be assigned to Fireside.   And recently, in July, 2003, when plaintiff Linda Dedrick informed an employee at the Resident Selection Office that she sought an assignment at Fireside because of her mobility impairment, she was told that only

---

[2]      Based on plaintiffs' discovery, over a quarter of the disabled persons to be admitted to Fireside between 1999 and 2003 (applicants Bailey, Daniels, Horton, Lloyd, Nieves, and Twigg) requested assistance from a local politician, received advocacy from or knew personally a BHA staff member, or took legal action against the BHA.  See, e.g., Advocacy letter dated ___ (Exhibit 12).

elderly applicants could be assigned to Fireside.  <u>See</u> Plaintiff's Motion to Intervene dated ____, Dedrick Aff., ¶ 5.

These plaintiffs' experiences were shared by many others, including disabled BHA tenant Karen Roman.  In 2002, Roman enlisted the help of BHA official Bernavin Armstrong to help her with her request to transfer to Fireside from the Marina Village complex.  Even Armstong's assistance was not enough to overcome the policy barring the disabled from Fireside.  The denial of Ms. Roman's transfer because she was not elderly prompted Mr. Armstrong to request from Tracey Zennis, then manager of the Resident Selection office, and other BHA officials, an explanation of this policy.  A copy of Mr. Armstrong's memo documenting this incident is attached as Exhibit 13.   Though Ms. Roman complained about the denial to Betty Jones, in HUD's Hartford office, and to then Executive Director Collin Vice, without response or result, she too was eventually was referred elsewhere rather than being admitted to Fireside.  <u>See</u> Roman Aff. (Exhibit 14).  Indeed as recently as last month, proposed intervenor Kenneth Gihon was interviewed for public housing.  When asked to choose his first, second, and third choices among the BHA complexes, Mr. Gihon told the Resident Selection Office employee that his first choice was Fireside.  Upon learning that Mr. Gihon was disabled, the employee maintained that Fireside was currently "full."  She produced a form and wrote "Harborview" on it as the first choice and "Fireside" as his second choice, despite the fact that under the normal timeframe for processing

applications, Mr. Gihon would not in any case have been ready to be assigned for months to come.  <u>See</u> Gihon Aff. (Exhibit 15).

   **2.**    **The BHA Assigned the "Near Elderly" to Fireside Regardless of Disability, Under the Pretense of  Lawful Designation.**

 As discussed above, not only operated Fireside as if it had been legally designated by HUD as an elderly only project, but also took advantage of this elderly only pretense to admit working adults to Fireside rather than disabled applicants.

  In a lawfully designated project, a public housing authority is allowed to expand the scope of who is eligible to live in an elderly complex by including the near elderly.  The term "near elderly" is defined by statute to include persons between the ages of 50 and 61, but it is unclear whether the BHA uses this legal definition.  When describing Fireside, the defendants instead have referred to a 55-61 bracket they call "pre-senior" in some official communications, or to a two-tiered grouping of applicants 55-61 and 46-54 described in their 2002-2003 ACOP.  <u>See</u> Exhibit 10, Section F at p. 44; <u>cf</u>. 42 U.S.C. §1437a.   Thus, although 42 U.S.C. Section 1437e(a)(3), it only permits "near elderly" persons to be placed in an elderly project if the public housing authority determines that there an insufficient number of elderly persons to fill all available units, and, of course, only when the project has been lawfully designated.  By these standards, the BHA's version of near elderly eligibility and its reasons for using the category have always been blatantly unlawful.

For example, the BHA published advertisements seeking applications from "pre-senior and senior citizens age 55 and over." <u>See</u> Connecticut Post on March 13, 2002 (Exhibit 16).  In her capacity as Executive Director of the BHA, defendant Vice also personally wrote to fourteen different community leaders solicited applications for Low Income Public Housing from "pre-seniors and senior citizens age 55 and over" for the BHA's so-called "age restricted housing complexes." <u>See</u> Letter from Vice to Community Leaders (Exhibit 17).[3]

The BHA's reliance on the near eldery category at Fireside was also evidenced by the inclusion of these applicants with the elderly on an expedited interviewing schedule called the  "Senior Appointment List." (Exhibit 18).  Being offered an interview is the crucial first step in the application process–an applicant cannot do anything to move the process along until he or she has been interviewed. Interviews are ordinarily scheduled by sending a letter to all the persons who pre-applied on a given day; the Senior Appointment List was an exception to this practice that significantly reduced the time it took for an applicant to be deemed ready for assignment to public housing, as noted by former manager of the Resident Selection Office Anita Falco.  <u>See</u> Falco Depo. (Exhibit 19).

---

[3]    As indicated on the list of offices copied on the letter, notice was provided to the Office of Persons with Disabilities for the City of Bridgeport which is directed by Jeri Boyd, who, at the time notice was provided, was also a member of the BHA's Board of Commissioners.  Upon information and belief, Ms. Boyd and her office never took any action to challenge BHA policies or otherwise protect disabled people seeking BHA housing.

In keeping with the BHA's decision to ignore disability as a factor in admissions, both disabled and non-disabled "near elderly" applicants' names appear on the Senior Appointment List.  Nevertheless, tenants Harry Daniels and Judith Montes are claimed in affidavits by Anita Falco and Millie Morales to be persons admitted as disabled applicants, despite their appearance on the Senior Appointment List. Just as many near elderly applicants on the Senior Appointment were not disabled, such as:

| Name | Complex | Date of Offer | Age at Offer |
|------|---------|---------------|--------------|
| Cheryleann Taylor | Fireside | 5-15-03 | 58 |
| Doris Hartl | Harborview | 6-18-02 | 51 |

This policy of providing expedited interviews of "near elderly" applicants who had been identified on the special appointment list for elders, rather than interviewing all applicants in the order that they applied, was essential in order to keep Fireside full in spite of the lack of demand for elderly housing.

 Bridgeport Fair Housing Officer Joseph Wincze also opposed the housing of "near elderly" tenants in place of the disabled when he was asked to review the BHA's Annual Plan for 2002.  Wincze questioned the legal basid for who the BHA considered to be "near elderly." See Wincze letter dated June 26, 2002 (Exhibit 20). Mr. Wincze indicated that this policy would violate discrimination laws to the extent it displaced eligible disabled tenants.  Id. On June 28, 2002, defendant Vice

responded by stating that the BHA would scale back her definition of "near elderly" by raising the minimum age for near-elderly status from 46 to age 55. She first explained that "resources will be made available for persons who are disabled" who will be excluded from elderly disabled housing, but then added that "we must advise that we have had unsuitable conditions when we mixed the elderly and disabled communities together in a housing situation thereby making it necessary that we identify certain complexes as elderly only." See Vice Letter dated June 28, 2002. (Exhibit 21).

 These statements led Mr. Wincze to re-visit the possibility that Fireside was already being operated as an elderly only complex.   Mr. Wincze's suspicions were confirmed by Tracey Zennis, who, in 2002, was managing the Resident Selection office, and by defendant DeGuzman.  They verified that the BHA was excluding the disabled and assigning apartments at Fireside only to the elderly. Mr. Wincze relayed the results of his investigation to defendant Vice, with a copy sent to Betty Jones of HUD's Hartford office. Wincze letter dated December 2, 2002 (Exhibit 22).  He received no response from either HUD or the BHA.

 Although defendant Vice's statement quoted above about her purpose in designating Fireside mentioned the need to devote equal resources to the disabled, the BHA has never done so. Defendant deGuzman, for example, admitted in his deposition that the BHA's only plans for the disabled include using *existing* Section 8 vouchers to house the disabled, a resource that it had already employed

for any applicant whom its could not house, as described infra in Section E of this brief. See DeGuzman Depo. (Exhibit 23).

 As defendant Vice's exchange with Wincze shows, the BHA never based its decision to designate Fireside elderly and near-elderly on an assessment of the housing needs of those groups in Bridgeport. The defendants' most ambitious plans for elderly designations, which included extending the policy to 20% of the BHA's units, were announced in 2002-2003, just after defendant Vice had reported to the BHA's Commissioners that there were just 55 applicants for elderly housing on their general waiting list of approximately 1,000 names–about 5% of the list. See BHA Minutes of September 9, 2002 (Exhibit 24).

 Reliable third party sources confirm the disparity between the needs of disabled applicants and elderly applicants at the time these designation plans were formulated.  Sources such as U.S. census data, which the BHA was required to consider as substantive input into its annual plans, showed that about twice as many disabled people in the Bridgeport area were in need of affordable housing as compared to the elderly at this time. See Annual and Five Year Plan 2003, Statement of Housing Needs, (Exhibit 25)  The City of Bridgeport's Affordable Housing Plan, required by HUD as a condition for continued receipt of federal assistance, concluded that housing for the elderly in Bridgeport is a low priority, based on the ample number of privately owned complexes devoted to the elderly. See CHAS (Exhibit 26).  Adopting the near elderly policy in the face of these

numbers could only have been a response to the defendants' desire to preserve the elderly only character of Fireside, not an attempt to serve the housing needs of its jursidiction, since the near elderly group's needs were already being served.

### 3.    Results of the Elderly Only Policy at Fireside

The BHA's recruitment of near elderly tenants and the creation of an expedited Senior Appointment List succeeded in preserving the elderly character of Fireside. Exhibit 27 lists all of the residents of Fireside as of March, 2004. All occupied apartments housed either elderly or near elderly tenants. Tenants who were elderly on the date they were offered a unit occupied 186 of the 240 occupied apartments in the complex. The remaining  apartments were occupied by near elderly tenants. Of the 54 near elderly tenants, 34 were disabled as evidenced by their receipt of Social Security disability benefits, and 20 were not disabled.

### D.    Facts Regarding Failure to Offer Disabled Applicants Other Housing.

The BHA not only fails to offer the disabled their fair share of Fireside, but it also fails offer disabled applicants as many units as it offers the elderly in any of its complexes. Thus, exclusion from Fireside is part of a more pervasive discrimination evident throughout the BHA's policies and housing assignments.

### 1.    The BHA Modified its Application to Ignore Disability as a Basis for Eligibility for Public Housing.

In or about 1999,  the BHA deleted questions from its initial application form (commonly referred to as a "Pre-Application") that were intended to solicit

information that would identify people who may be eligible for elderly/disabled
housing.  Specifically, it deleted the question: "Are you qualified for a unit
available for a person with a disability?" which was followed by the notice that
"(s)ome evidence of your eligibility may be required."  <u>See</u> Pre-Application
submitted in March, 1998, question 10 (Exhibit 28).  An earlier version of the
application had included the similar question: "Is the head of household
handicapped or disabled?" <u>See</u> Pre-Application submitted in April, 1993, question
10 (Exhibit 29).  The pre-application that replaced these prior versions and that is
currently in use requires that age and date of birth be listed, thereby identifying
eligible elderly tenants.  However, it fails to ask any question that would identify
whether the applicant is disabled and therefore eligible for elderly/disabled
housing.  <u>See</u> Pre-application submitted on October 22, 2002 (Exhibit 30).   With
this revised form, the only indication that an applicant is disabled is by whether the
applicant reports receipt of Social Security disability benefits as his or her income
on the application.

 Pursuant to public housing regulation, the definition of a "person with
disabilities" includes a person who "has a disability, as defined in 42 U.S.C. §423"
which is the statutory section defining the meaning of "disabled" for purposes of
determining entitlement for Social Security disability benefits.  5 C.F.R. §5.403.
This regulation defines a disabled person as either a person who has been
determined eligible for Social Security disability benefits, *or* a person who has a

physical or mental impairment that meets the Social Security standard for "disabled," but who may not yet have been determined to be disabled by the Social Security Administration. It is quoted within the BHA's own ACOP.  The current pre-application only succeeds in identifying those persons who already receive disability benefits as "disabled."  As a result, it fails to count as disabled those disabled people who are waiting, sometimes for years, to have their claims finally adjudicated at Social Security, or who recieve some other benefit such as a pension.  These persons are listed by the BHA as neither disabled or elderly and therefore are not considered for elderly/disabled housing because the pre-application data is entered into a computer that generates the waiting list used by the BHA to determine eligibility for elderly/disabled housing.  In this manner, the BHA underestimates by about 32% the number of disabled persons on the waiting list. See List of Nonidentified Disabled Applicants in December 2002 (Exhibit 31).

 For example, proposed intervenor Kenneth Gihon's eligibility would have been overlooked under the current system.  Mr. Gihon is a homeless 41 year old man who is severely disabled by both physical and mental impairments, and yet was not listed on the waiting list as "disabled." See Exhibit 15.  Because he seeks housing only for himself, and was not identified as "disabled," a Resident Selection Office employee informed him that his housing options were limited to a one bedroom apartment at Marina Village.  Mr. Gihon was familiar with Marina Village and knows it to be drug infested, noisy and dirty.  Id.. ¶ 7.  The Resident Selection

employee produced a "Tenant Preference Form" form and wrote down on Mr.

Gihon's behalf that Marina Village was his first choice.  Id.  Upon advice of

counsel, Mr. Gihon delivered to the BHA medical treatment records which

document his disability.  After reviewing the records, the Resident Selection

employee informed him that he would be considered for elderly/disabled housing

and that he would not be referred to Marina.  Id.

 It is the obligation of public housing authorities to "inform all applicants about

available preferences and must give applicants an opportunity to show that they

qualify for available preferences," such as eligibility to live in housing for the

elderly and disabled. 24 C.F.R. §960.206(a)(4).  Mr. Gihon avoided being

undercounted and deprived of his right to elderly/disabled housing only by

obtaining corrected eligibility information from counsel.  The BHA's current

"disabled blind" application ensures that it will fail to properly identify and inform

disabled applicants, as required by regulation.

A.    **By Expediting Elderly and Near-Elderly Applicants, the BHA
Delays Disabled Applicants' Access to *Any* Public Housing.**

Excluding all disabled persons not deemed "near elderly," as well

as all but a handful of those qualifying as near elderly required the BHA to

abandon its standard method for  processing applications and caused

vacancies.  For example, the Senior Appointment List described above

required the BHA to operate contrary to the portion of the ACOP which

states that "All applications will be maintained in order of date and time of application receipt." <u>See</u> Exhibit 10.   Its larger effect was to speed the process for all elderly applicants.   A number of  "near elderly" applicants interviewed off of the Senior Appointment List were admitted to either Fireside, but others became part of the elderly majority at Harborview and the scattered site units.   Examples of near elderly persons –both disabled and non-disabled–  who were interviewed off of the Senior Appointment List and assigned units in elderly/disabled housing other than Fireside are set forth below:[4]

| Name | Complex | Date of Offer | Age at Offer |
|------|---------|---------------|--------------|
| Korah Sternberg | Scattered Site | 9-25-02 | 55 |
| Mary Breeden | Scattered Site | 7-3-02 | 57 |

ADD HARBORVIEW

As a result, Disabled applications sat unprocessed until and unless they were needed to fill vacant units.   At least __ out of the ___ 2002 applicantsstill on the waiting list in 2004 when discovery commenced are disabled applicants. <u>See</u> July 27, 2004 Waiting List for One Bedroom Units (Exhibit 32). This number far exceeds the disabled share of the overall waiting list, about 29%.   In contrast, the only elderly applicants

---

[4]    Otero fn & 46-54 ACOp section

from 2002 who had yet to be housed as of March 2004 remained on the list for self-imposed reasons. Examining the file of elderly applicant Iris Villafane, for example, shows that the only reason that Ms. Villafane remained as the lone elderly applicant from 2002 still in need of housing was that she had not become elderly until her birthday December 27, 2003.  Moreover, as a 61 year old, near-elderly applicant, Ms. Villafane had been previously offered housing which she turned down.  In addition, elderly applicants like Betty Dixon, remain on the list even though they were offered housing long ago.

The disparity in interviewing effects the BHA's entire application processing timeline, such that disabled applicants during the past year still waited seven or eight months more than elderly applicants to be granted an intial interview by the BHA. See Individual Comparison: Awilda Rosado (Exhibit 33). The individual comparison above appears to be true over the entire class of disabled applicants, as illustrated by the group chart below shows the number of days that successful applicants in each eligibility category have waited for a unit of BHA public housing.  It was compiled by first determining the number of days waited, by counting the days that elapsed from the date when the initial pre-application was filed until the date that a unit of public housing was offered to the applicant, and then averaging the number of days waited for members of the same eligibility

category.   It includes data gathered from every file that defendants'
counsel presented to plaintiff's counsel as belonging to a current tenants of
a one-bedroom unit of BHA public housing, provided that such files
indicated both the date when the tenant applied and the date when the
tenant was offered a unit.

### AVERAGE NUMBER OF DAYS WAITED FOR PUBLIC HOUSING

| Eligibility Status | Fireside Avg. | Harborview Avg. | Marina Avg. | Scattered Sites Avg. | All 1 BDR Avg. |
|---|---|---|---|---|---|
| **Elderly** | 268 | 236 | 107 | 173 | 196 |
| **Near-Elderly (non-disabled persons aged 55-61)** | 294 | 303 | 166 | 222 | 241 |
| **Families (non-disabled persons aged 18-54)** | NA | 289 | 509 | 233 | 344 |
| **Disabled** | 382 | 332 | 542 | 241 | 374 |

The chart above shows that elderly applicants are housed on
average within 196 days, wheras the process takes disabled applicants 374
days.  This disparity suggests that delayed interviewing costs disabled
applicants at least six months of shelter, as compared against the elderly.

**3.    Recent Assignments Continue to Favor the Elderly.**

Defendants currently claim that they are properly operating Fireside "as an

elderly/disabled complex and that non-elderly disabled applicants are eligible for units there." Def. Mem. Opposing Class Cert., dated June 30, 2004. They cite to two affidavits, one from Marmily Morales, the current manager of the Resident Selection office, and one from Anita Falco, its former manager. Their affidavits list assignments of apartments at Fireside between from July, 2003 through July, 2004. These affidavits list each new tenant as either over 62 years of age or not, and either disabled or not, without stating whether disability was the basis on which the housing was offered. INSERT ASSIGN/OFFER FN. Every new Fireside tenant during this period was, consistent with past practice, eligible as either an elderly or a near elderly applicant under the fake designation system set up by the defendants.[5] The elderly recieved 60% out of the thirty offers of Fireside units made by Ms. Morales and Ms. Falco. See Chart of One Bedroom Unit Offers July 2003-July 2004 (Exhibit 34). The elderly received 42% of all the 86 offers made by Ms. Falco and Ms. Morales to any unit of one-bedroom public housing went to the elderly, even though this eligibility group made up just 20% of the 800? total number of persons on the waiting list in July of 2004. Disabled persons

---

[5]    Otero fn & 46-54 ACOp section

under the age of 46 overall recieved just 11 of the 86 Morales/Falco offers,
even though they make up about 14% of the July 2004 waiting list.

**E.    Facts Regarding the Named Plaintiffs**

Plaintiff Linda Dedrick is 51 years old, disabled by severe arthritis
and orthopaedic impairments affecting her back and legs, who relies
entirely on Social Security disability benefits as her sole source of income.
Ms. Dedrick is currently homeless.

Ms. Dedrick filed an application for a public housing unit with the
BHA on June 24, 2003.  Until recently and for the past several years,, she
had been living in the neighborhood of the Fireside Apartments.   Ms.
Dedrick wants to remain in the neighborhood and she needs a ground floor
unit due to her mobility impairments.  Fireside was a good fit for her
because it is in her neighborhood and all units are on the ground floor.   In
July, 2003, shortly after she applied, Ms. Dedrick contacted the BHA to
inquire about the availability of Fireside apartments.  She was told by a
BHA representative that at 50 years of age, she was not eligible for
Fireside, and that she would not be eligible until reached age 62.

By February, 2004, the premises that Ms. Dedrick was renting had
declined to an uninhabitable condition.  Water leaks in the kitchen sink
area, in the bathtub and shower, resulted in housing code violations.  The
furnace was tagged so that it could not be operated in or about February,

2004 so that it could not be operated because of the smell of leaking gas. The water heater for Dedrick's apartment also leaked.   Other violations regarding peeling paint and the need for cosmetic repairs were also recorded.  Ms. Dedrick paid approximately 72% of her income for the privilege of living under these conditions.

As a result of these conditions, Ms. Dedrick eventually was compelled to vacate her home on or about May 14, 2004.  She has been homeless ever since.  She put all of her furniture and personal property in storage until she could secure habitable, affordable housing.  Ms. Dedrick carries a suitcase with her at all times containing several changes of clothing and several personal items.  She stays alternately at the homes of one of her daughters, a son, and a friend.  She moves from place to place every other day so as not to
wear out her welcome at any one of the three places.

 Several days after she vacated her apartment, Ms. Dedrick  hand delivered a note to the BHA's Resident Selection office indicating that she would be living with her various children and leaving a phone number at which she could be reached.  To date, the defendant BHA has not contacted her to schedule an eligibility interview.

**ARGUMENT**

The party moving for an injunction, whether preliminary or permanent, must show that failure to impose the injunction creates a risk of irreparable harm. See Standard & Poor's Corp. v. Commodity Exchange, Inc., 683 F.2d 704, 711 (2d Cir. 1982). Injunctive relief is an equitable remedy available only where there is no adequate remedy at law. Temporary restraints and preliminary injunctions are only appropriate where the irreparable harm appears to be imminent. See Citibank, N.A. v. Nyland (CF8) Ltd., 839 F.2d 93, 97 (2d Cir. 1988). However, the threatened harm need not have occurred yet to grant relief. See Mitchell v. Cuomo, 748 F.2d 804, 806-808 (2d Cir.1984) (affirming injunction granted before prison was actually closed, as the closing itself would then be irreversible).

Injunctive relief is particularly appropriate in housing cases because being deprived of housing is likely to result in irreparable harm. Ruiz v. New Garden Township, 232 F. Supp. 2d 418, 428-29 (granting injunction, citing Butler v. HUD, 595 F.Supp. 1041, 1046 (E.D. Pa. 1984)); Shelter, like other basic human needs, is the type of deprivation that temporary restraining orders were intended to address. Ward v. Thomas, 895 F. Supp. 401, 402 (D. Conn. 1995).

When a violation of the Fair Housing Act is established, irreparable harm is presumed to flow from the discrimination. The

Stewart B. McKinney Foundation, Inc. v. Town Plan and Zoning Commission of Town of Fairifield, 790 F.Supp. 1197, 1208 (D.Conn. 1992) citing Gresham v. Windrush Partners Ltd, 730 F.2d 1417, 1423 (11th Cir.), cert. denied, 469 U.S. 882 (1984).   A traditional showing of irreparable injury is not required when plainiffs seek to prevent a violation of a federal statute which specifically provides for injunctive relief.  Id. citing Baxter v. City of Belleville, Ill., 720 F.Supp. 720, 734 (S.D. Ill. 1989).   The federal Fair Housing Act, and specifically 42 U.S.C. Sec. 3613, provides for injunctive relief.

Plaintiffs must also demonstrate that they are likely to succeed on the merits of their case.  Hirschfield v. Board of Elections, 984 F.2d 35, 39 (2d Cir. 1994).  Likelihood of success does not mean a certainty of success.  Abdul Wali v. Coughlin, 754 F.2d 1015, 1025 (2d Cir. 1985).  A greater than fifty percent probability of success is sufficient.  Id.

Any balancing of the hardships will clearly favor the plaintiffs since they are asking only that the defendants finally, after many years, comply with federal laws that are supposed to govern the operation of the Bridgeport Housing Authority.

**A.  Plaintiffs and Proposed Class Members Will Suffer Irreparable Injury if Injunctive Relief is Not Granted.**

**B.      Plaintiffs and Proposed Class Members are Likely to Succeed on the Merits.**

The scope of federal fair housing laws includes transactions related to "dwellings."  Dwellings are broadly defined to cover any building occupied or intended to be occupied as a residence. 42 U.S.C. Sec. 3602(b).  Residential housing owned and operated by the BHA are therefore withing the reach of the Fair Housing Act. 42 U.S.C. Sec. 3601 et seq.

The Fair Housing Act makes it unlawful to discriminate against an otherwise qualified person in the rental of housing based on that person's protected characteristic or membership in a protected class.  Since 1988, disabled persons have been protected by the Act.

Congress passed the 1998 Amendments to the Act added persons with handicaps as a protected class because disabled persons "have been denied housing because of misperceptions, ignorance, and outright prejudice."   Housing Discrimination, Schwem, Robert, Updated to 7/04, Section 11D:1, citing U.S. House of Representatives, Committee on the Judiciary, Report 100-711: the Fair Housing Amendments Act of 1988 at 80-81, 86-88, 90, 100th Cong., 2d Sess. (1988)(hereinafter "House Report").  The law "repudiates the use of stereotypes and ignorance, and mandates that persons with. handicaps be considered as individuals.  Generalized perceptions about disabilities and

unfounded speculations about threats to safety are specifically rejected as grounds to justify exclusion." Id

The definition of a person with a handicap under the Fair Housing Act, Section 504 of the Rehabilitation Act of 1973, and the Americans with Disabilities Act are virtually the same and is far broader, and therefore encompasses the definition of a "person with a disability" that is employed for public housing eligibility purposes. Thus, anyone who meets the public housing definition of "disability" is protected under these federal disability laws.

Under the discrimination laws, a person with a handicap is any person who has a physical or mental impairment that substantially limits one or more major life activities, who has a record of such an impairment; or who is regarded as having such an impairment. 24 C.F.R Sec. 100.201. "Major life activities" include caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, learning and working.

For public housing purposes, a "person with a disability" is defined as (1) someone who is unable to work under the standard for receipt of social security disability benefits under 42 U.S.C. Sec. 423; (2) or who is substantially impeded in his or her ability to live independently or is of such a nature that the ability to live independently could be improved by more suitable housing; or (3) has a developmental disability as defined in 42 U.S.C. Sec. 6001. 24 C.F.R. Sec. 5.403.

Plaintiffs and proposed class members are persons with disabilities under the public housing definition. Plaintiff Linda Dedrick and proposed class member John

Nelson are unable to work and receive Social Security disability benefits, while proposed class member Jennifer Marichal is deaf -she alternately relies upon SSI disability benefits and employment income to support herself - and, has been substantially impeded in her ability to live independently.   As discussed below, Ms. Dedrick, Ms. Marichal and Mr. Nelson, and many others in their situations, have been discriminated against by the defendants based on their handicapped status.

1. **All Plaintiffs and Proposed Class Members Have Been, or Will Be, Denied An Opportunity to Rent an Apartment at Fireside or Otherwise Have Such Housing Made Unavailable to Them.**

    42 U.S.C. Sec. 3604(f)(1)(A) makes it unlawful to discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of that buyer or renter.   Section 3604(f)(2) makes it unlawful to discriminate in the terms, conditions, or privileges of sale or rental of a dwelling because of a person's handicap.  As explained below, the defendants have violated both provisions by denying and making unavailable to the plaintiff class  apartments at Fireside intended to house disabled people, by creating an additional eligibility criteria not permitted by law that tends to discriminate against disabled applicants and BHA disabled tenants seeking to transfer, and by steering disabled persons to Harborview Towers.

2. **Defendants Have Intentionally Discriminated Against the Disabled by Excluding them From Fireside**

Violations of 3604(f)(1) and (2) can be established by one of two methods. The plaintiff class may show that defendants intended to discriminate against the plaintiffs and proposed class based on their handicapped status by proving disparate treatment of the class. Cason v. Rochester Housing Authority, 748 F.Supp. 1002, 1006 (W.D. N.Y. 1990). A discriminatory treatment analysis considers differential treatment of similarly situated persons. It requires a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available" to show that the disabled status of the plaintiffs and proposed class was a motivating factor in the decision to impose the age eligibility criteria. The Stewart McKinney Foundation Inc. v. Town Planning and Zoning Commission of Town of Fairfield, 790 F.Supp. 1197, 1211 (D.Conn. 1992) quoting Village of Arlington Heights v. Metropolitan Housing Development Corporation, 429 U.S. 252, 266 (1077). Factors to be considered in evaluating a claim of intentional discrimination include: (1) the discriminatory impact of the governmental decision; (2) the decision's historical background; (3) the specific sequence of events leading up to the challenged decision; (4) departures from the normal procedural sequences; and (5) departures from normal substantive criteria. Village of Arlington Heights v. Metropolitan Development Corp., 429 U.S. 252, 266-68 (1977); Tsombanidis v. West Haven Fire Department, 352 F. 3d 565, 580 (2d Cir. 2003); Plaintiffs need not show that defendants were motivated by some purposeful, malicious desire to discriminate against the disabled. They must only show that disability status was a motivating factor in the decision to impose an additional eligibility requirement. The Stewart McKinney

Foundation Inc. v. Town Planning and Zoning Commission of Town of Fairifield, 790

F.Supp. at 1211.

Alternatively, plaintiffs may show that the BHA's additional, extra-legal

eligibility criteria has a "disparate impact" upon disabled persons.  Under this second

method, the court must consider whether the effect of defendants' eligibility criteria is

unnecessarily discriminatory even though the plaintiffs do not show any intent

discriminate.  The Stewart McKinney Foundation Inc., 790 F.Supp. at 1211.

**3.      Proposed Plaintiff Class Seeks to Enjoin the Unlawful Use of Age Eligibility
          Criteria for Determining Eligibility for a Fireside Apartment.**

At least until May, 2003, and even after plaintiff Matyasovzsky had filed a

complaint at CHRO in December, 2002,  BHA officials have openly stated, even to an

attorney who advocates on behalf of low income tenants and has sued the BHA over its

unlawful practices in the past, that the BHA has operated Fireside as if it had been

designated an "elderly only" complex and that the disabled have been excluded.  See

Tenenbaum Affidavit sworn to August 11, 2004.   Since BHA officials regarded Fireside

as elderly only, they felt entitled to rely upon a privilege granted to operators of elderly

only complexes.  They expanded the pool of applicants who are eligible for their

unlawfully designated elderly project by also admitting the "near elderly."  Though

federal law defines near elderly persons as being between ages 50 and 61, the defendants

have expressed their own conceptions of what age makes a person "near elderly,"

claiming at various times that the necessary age was 46, 50, and 55.  Every action taken

by defendants with regard to Fireside has been intended to make and preserve Fireside exclusively as a complex for older, elderly tenants at the expense of disabled persons statutorily entitled to live there.[6]

Defendants most recent claim that they operate Fireside lawfully was made in their recent papers opposing class certification.  In their June 30, 2004 memorandum in opposition to class certification, defendants assert that class is relief is not necessary because they "acknowledge that the Fireside Complex is currently being operated as an elderly/disabled complex and that non-elderly-disabled applicants are eligible for units there."  Defendants' Memorandum, dated 6/30/04, p. 18.  Defendants do not acknowledge what they were previously doing so as to require current corrective action.  Nor do they explain what they are doing differently to bring them into compliance with the law.  In fact, defendants obscure what they are doing currently by

_____

[6]    Since at least 2002, defendants have claimed that they intend at some point to apply to HUD for lawful designation of Fireside as elderly only.  However, at a recent public hearing on the filing of the BHA's 2003 Annual and Five Year Plans and their newly amended ACOP, defendant Jonas DeGuzman stated that the BHA was withdrawing its intent to seek designate Fireside and other units as elderly only.  When asked by a member of the public why they had done so, DeGuzman said it was because of the pendency of this lawsuit.  As discussed above, applications to HUD to exclude a group of people have to be supported by evidence that alternative housing resources will be made to the excluded group.  By acknowledging the reason for withdrawing their plan to designate,  DeGuzman and the BHA were simply acknowledging an application submitted at a time when years of discrimination against the disabled at Fireside was being exposed, would not pass  good faith scrutiny.  It is also clear from DeGuzman's answer that the BHA has not given up on the idea of seeking elderly only designation once the dust from this case settles.

failing to indicate to the Court in their Memorandum the ages of the people receiving disability benefits who have been admitted in the last year.[7]

A review of relevant data for persons admitted to Fireside from July 1, 2003 to the present shows that most assignments of units were to the elderly (62 and over) and that those made to people who the BHA now wishes to regard as disabled were made to person who are between the ages of 50 and 61, that is, to persons who are "near elderly."

As discussed below, these admissions show that the BHA continues to operate Fireside as an "elderly only" project. They are using the "near elderly" category they have always employed but now in a cynical way to represent to this Court that they are complying with their legal obligation to admit the disabled to Fireside. Since the project is not lawfully designated as elderly only, the BHA cannot lawfully resort to the "near elderly" definition of a lawful tenant for Fireside. What is even clearer, the defendants cannot resort to the "near elderly" definition to exclude the disabled from its housing.

---

[7]    As argued herein, plaintiffs do not believe that admission of near elderly who are disabled negates the discriminatory intent and impact of the BHA's self created admissions criteria. Defendants have not voluntarily ceased to discriminate, they have simply decided to discriminate in a different way. In any case, in this regard, the defendants would have to prove that there is no reasonable expectation that the alleged violation will recur and that the actions voluntarily taken have completely and irrevocably eradicated the effects of the alleged violation. Tsombandis v. West Haven Fire Department, 352 F.3d 565, 574 (2d Cir. 2003). It is a heavy burden for the BHA to prove that they would not again discriminate against the disabled, given the years of blatant discrimination endured by the disabled, and the BHA's stated intention to designate so much of their housing stock, including much of their elderly/disabled housing, as elderly only.

The defendants rely on two virtually identical affidavits drafted for Anita Falco and Millie Morales. Ms. Falco was briefly the Coordinator or Manager of the Resident Selection Office before that position was given to Ms. Morales December 23, 2003.

Before discussing the assignments made as reflected in the affidavits, it is necessary to correct a false assumption made by the BHA when attributing an elderly and/or disabled status to the persons mentioned. Both affidavits incorrectly assume that an applicant may be considered disabled even if they fit into the near elderly or elderly category by virtue of their age. They assert that a person can simultaneously be disabled and elderly. Thus, Ms. Falco claims in her affidavit that applicants Rita Zamfino, Robert Schwartz, and Barbara Piccolo were disabled and over the age of 62 when Falco assigned them an apartment at Fireside. Ms. Morales also claims in her affidavit that Effie Davis, Charlotte Wallace, and Jaluhi Slocum were disabled and over 62 when assigned a Fireside unit.

Under law, an applicant may not be regarded as both disabled and elderly. An applicant is one or the other. An elderly applicant is one who is 62 years of age or older. CITE. If an applicant meets the age requirement, there is no need or purpose for determining if that person is also disabled. Their status is determined by their age. If the BHA were only obliged to admit the disabled regardless of their age, there can be no doubt that these defendants would recruit and admit applicants who were 75 or 80, people who are likely at that point in their lives to have some sort of impairment that would prevent them from working as that concept is understood under the Social Security Act to

ensure compliance with their obligation to operate a "mixed occupancy" project.  The absurd implications of such a "dual status" alone make it clear that federal law does not authorize the use of such a concept.

As already discussed, mixed occupancy projects are for the elderly (62 and over) and for tenants who meet the definition of "disabled.".  As the Designated Housing statute, 42 U.S.C. Sec. 1437e, makes clear, applicants who are under the age of between the ages of 50 and 61 may be lawfully admitted only if the mixed occupancy project is lawfully designated by HUD as "elderly only" and then only if there are an insufficient number of elderly persons to fill available units.   42 U.S.C. Sec. 1437a(b)(3).

These legal points have never stopped the BHA.  Over the last five years, they have admitted the "near elderly" on a number of occasions. They have generally confined their unlawful admissions of such persons to those 55 or over.

For example, prior to October 19, 1999, ___ people admitted or transferred into Fireside were in the "near elderly" category. _____ were not disabled, while ____ were receiving disability benefits when they received their assignment.  Exh. ___ chart of near elderly for complex.

From October 19, 1999, when Bridgeport Fair Housing Officer gave notice to the BHA that their operation of Fireside as elderly only was unlawful, until May 30, 2003 (CAN WE CHANGE THIS DATE TO 6/30/03????), when this lawsuit was commenced, the defendants admitted four applicants who were near elderly.  Current tenants Lydia Caban, Saturnino Figueroa, and Cherylann Taylor were not disabled and were near

elderly when they were offered a Fireside unit.  Mr. Figueroa was 62 by the time he signed the lease.  Ms. Caban was 61.   Ms. Taylor was 58 when she received her offer. See exhibits _____ chart of F tenants.  The fourth person, Agnes Thompson, provides two different dates of birth in the documents she submitted to the BHA.  With one date, she was 61 when she received her offer; using the other date, she was in fact 62 on the date of offer.   Selected documents from the files of Ms. Thompson and Caban are attached hereto as exhibit _____.

One near elderly person was transferred into the complex during the same time period.  John Graham was disabled and 57 years old when he was granted a "Temporary Relocation" to Fireside.   Offer letter to John Graham dated 7/31/03, attached hereto as exh. ___.  According to the ACOP, the BHA relocates tenants temporarily or permanently when it intends to rehabilitate a complex or declare them uninhabitable. ACOP, 2002-2003, Chap. 9, p. 95, exh. _____.   Thus, Mr. Graham was transferred for administrative reasons and was not assigned a Fireside apartment based on his disability. (WERE THERE OTHERS WHO ARE LEFT OUT OF THIS ACCOUNT BECAUSE OF ERRORS IN OUR DATA?  I ASK THIS BECAUSE THERE WAS ONE NAME THAT WE WOULD HAVE LEFT OUT BASED ON OUR DATA IF THEY HAD NOT LISTED HER IN THEIR MORALES FALCO AFFIDAVITS.  I THINK IT WAS ANNA MARTINEZ.)

For the period of July 1, 2003 to the present, it is clear that the BHA continues to maintain an age limit to ensure that all who are admitted are in the near elderly category.

To the extent any non-elderly persons are being admitted, they must have attained the age of 50 to be considered eligible.   Two persons under 50, Judith Montes and Harry Daniels, were admitted under such unusual circumstances that there admissions do not cloud the clarity of the BHA's present requirement that a person must be "near elderly." Moreover, since the BHA has maintained in the past that their notion of "near elderly" encompassed tenants who were between the ages of 46 and 61, these two persons may have been admitted as near elderly as well.

Thus, prior to July 1, 2003, it is clear that near elderly assignments were made not on the basis of disability; the greater proportion of the near elderly were, in fact, not disabled.   Assignments were made based on assignee's status as near elderly and, at the very least in some cases, based on extraneous interests of the BHA.

While BHA officials are not as open as they once were about their eligibility criteria for Fireside, it is clear from who they have assigned that an applicant must be at least 50 years old to be eligible for a Fireside apartment.   Thus, while no additional eligibility criteria have been created for elders beyond what is required under federal law; and applicants in the general population are not required to reach a certain age to receive an apartment for which they are eligible nor has the BHA devised any other eligibility criteria for them, disabled applicants alone must be 50 to receive housing in an elderly/disabled mixed occupancy complex.

      **4.**       **The Arlington Heights Factors**

### a.    The Discriminatory Impact of the Near Elderly Eligibility Criteria

There can be no doubt in this case about defendants' intent to discriminate against the disabled.   Collin Vice, in her June 26, 2002 letter, clearly states an intent to discriminate against the disabled by separating them from the elderly.  She specifically mentions her intent to use the near elderly concept to expand the elderly applicant pool and to exclude the disabled in the same breath.  Ms. Vice and the defendants' admissions to Fireside make it evident that disability status was the only motivating factor resulting in the BHA's decision to require Fireside tenants to be near elderly, ie. at least 50 years old. The defendants have made Fireside "otherwise unavailable" to the disabled within the meaning of the statute.

Only two groups receive a preference for elderly/disabled housing.  Over the last five years, the "50 or above" age requirement has only benefited applicants in the elderly category by allowing the elderly to qualify at an earlier age.  Only disabled applicants, who under federal law are not required to meet any age requirement, are adversely impacted by this extra-legal admission criteria.  The BHA has not imposed any additional eligibility criteria for elderly applicants.

Given that the BHA unlawfully admitted the near elderly over the years in order to have a sufficient number elderly to fill available units  - some near elderly received disability benefits, most did not, meaning that the "disabled" status of any particular was not even relevant to the BHA - defendants should not be permitted to admit the near-

elderly who are disabled and claim that they are not discriminating against the disabled.

Defendants should not be permitted under the circumstances to claim they are finally

honoring their legal obligation to the disabled as they maintain Fireside as an elderly only

complex and prepare their next application to HUD to designate the project as elderly

only.   The defendants are asking the court to participate in a subterfuge intended to

preserve the discriminatory results of their practices over the years.

   Even if court considers the near elderly admitted in the last year to be "disabled"

for fair housing purposes, the defendants' new eligibility criteria is illegal.  For those

disabled applicants under 50, they have no prospect of ever living in a Fireside apartment.

They are now, and always have been, absolutely ineligible.  For those disabled applicants

between ages 50 and 61, they too are being subjected to an additional, unlawful eligibility

criteria, unlike elderly applicants.  The differential treatment afforded both under 50 and

50 and over disabled  is motivated entirely by their handicap status. The BHA has created

a stigma upon the disabled.   If the it is the case, as defendant Vice argued in her letter to

Joseph Wincze back in 2002 that the disabled and the elderly do not mix well, it is the

disabled who have been stigmatized.  They are the ones excluded, not the elderly.  It is

for the elderly that the BHA is constantly preparing to apply for elderly only status.  BHA

officials  have signaled their intent to seek designation of elderly only status for 493 of

the BHA's _____ units, approximately one sixth of their housing stock, in an area that

already has plenty of housing for the elderly.  See exh.  Bridgeport CHAS, p. ___ and

with a public housing authority that has twice the number of disabled as elderly on their

waiting list and generally in need of low income housing in the community.  Exh. ____ wait list numbers and person in need number.   The discriminatory impact and the goal and purpose of the criteria strongly supports a finding of intent to discriminate based on handicap.

> **b.      The BHA has a Long History of Discriminating Against the Disabled in Their Admissions Practices.**

As discussed at length in the fact section, the BHA has discriminated openly in excluding the disabled from Fireside.  They have made many public statements to this effect.  For years, disabled people inquiring about Fireside,  like plaintiff Matyasovzsky, have been told that the complex is limited to tenants 62 and over. Fireside was listed as elderly only on the BHA website.  As the demographics of tenants in occupancy clearly show, the BHA has accomplished what is set out to achieve.  The BHA has, in fact, admitted tenants consistently with their public and private statements.  The BHA now operates a complex without disabled people.

> **c.      Events Leading Up to the Challenged Practice.**

The defendants have been challenged on several occasions to stop discriminating against the disabled.   Bridgeport's Fair Housing Officer, 1999 and 2002, advised that excluding the disabled from a mixed occupancy project intended specifically for the disabled was unlawful.  The BHA received similar advice from Connecticut Legal Services and attorney Peter Griffin.  James Kordich, a HUD investigator, tried to settle an administrative compliant filed an applicant, Ms. Goss, by recommending that the BHA

stop excluding the disabled unless and until the BHA applies for and obtains formal designation of Fireside as elderly only from HUD.  Mr. Matyasovzsky's filing of a complaint with CHRO in December, 2002 was further notice to the defendants that they were violating the law.  Even the filing of this lawsuit has not brought change. Defendants apparently expect this Court to believe, after years of excluding the disabled while admitting select non disabled, near elderly tenants, that permitting a handful of near elderly applicants who are receiving disability benefits is compliance with the law.   This artifice is so transparent in light of the BHA's history of discrimination against the disabled.  It makes the BHA one of the biggest if not the biggest discriminators against the disabled and certainly more arrogant and oblivious to legal consequences  than any other public housing authority documented in the case law.

> **d.    Departures from the Normal Procedures.**

The over-50 rule is not authorized by the BHA's own ACOP, nor have the defendants attempted to change their ACOP to adopt this rule. Thus, the very existence this "unwritten" eligibility rule departs from what is normal.  Indeed, the fact that the defendants can only implement the over-50 rule by making numerous departures from their normal procedures for assigning applications, as described in part III, *infra*, including jumping over younger disabled applicants to assign the units to persons over 50, shows that the intent behind the rule is discriminatory.

Employing an extra criteria to systematically rid the housing authority of part of the disabled population  is contrary to federal law, which intended to provide housing for

disabled persons of *all* ages, and not just those deemed worthy by the BHA.  Case law is clear that a housing authority may not comply with the federal fair housing laws by electing to provide housing to just one portion of the group, even though the entire group is eligible by law.  In <u>Williamsburg Fair Housing Committee v. New York City Housing Authority</u>, for example, the housing authority's decision to informally designated 75% of its apartment units for whites, and 25% for hispanic and black applicants was deemed intionally discriminatory, even though a small portion of blacks and hispanic applicant pool had indeed been housed.  Specifically addressing the defendants' argument that no discrimination had ocurred because no one was ever *permanently* denied an apartment, the court found that causing black and hispanic applicants to wait longer for those apartments designated to their ethnicity was still an intentional denial of housing "at least for a time." <u>Id.</u> at 1248.

The same rationale would apply where the group to be excluded is the disabled community.  <u>See</u>, <u>e.g.</u>, <u>Cason v. Rochester Housing Authority</u>, 748 F.Supp. 1002 (W.D. N.Y.  1990). As in <u>Williamsburg Fair Housing</u>, the BHA's adoption of a rule that causes the protected group to be passed over on the waiting list, ignoring the ordinary chronological order in which applicants would ordinarily receive housing, evidences an intentional denial of housing, id. at 1245-48, inasmuch as it departs from federally required procedures.  Taken together, <u>Williamsburg</u> and <u>Cason</u> demonstrate that the act of passing over  disabled applicants on the waiting list in favor of elderly and near elderly

applicants violates 42 U.S.C. §3604(b), by discriminating in the terms and conditions of rental to disabled applicants, even if some of the near elderly applicants are also disabled.

        **e.    Departures from substantive criteria.**

## II.   DISPARATE EFFECT UNDER THE FAIR HOUSING ACT

In their statements and conduct, the defendants have evidenced an intention to discriminate against disabled people described in the proposed plaintiff class.   Their statements and conduct constitute not only an intent to discriminate against disabled persons, as described above in part I, but also a strongly disparate effect upon the proposed class as a whole as described in part II below, which also constitutes discrimination under the Fair Housing Act.

**Standard for Disparate Effect**

To make a case of disparate impact case, plaintiffs must show that a given practice has a greater impact on handicapped applicants than on non-handicapped ones. Cason v. Rochester Housing Authority, 748 F.Supp. at 1007, citing Metropolitan Housing Development Corp. v.  Village of Arlington Heights, 558 F.2d 1283, 1288 (7th Cir. 1977), cert denied, 434 U.S. 1025 (1978).   Discriminatory effect is shown with proof that all person negatively affected by an allegedly unlawful practice are handicapped.  Cason v. Rochester Housing Authority, 748 F.Supp. at 1007.

The disparate impact theory is directed to facially neutral policies and practices that have a discriminatory effect.  To establish a prima facie case under this theory, the

plaintiff must show (1) the existence of a facially neutral policy or practice and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts of practices. Tsombandis v. West Haven Fire Department, 352 F.3d at 574-75.

A plaintiff must prove the challenged practice actually or predictably results in discrimination. There must be a causal connection between the neutral policy or practice and the alleged discriminatory effect. Id. at 575. Plaintiffs must identify members of a protected group that are affected by the policy and then identify similarly situated persons who are unaffected by the policy. Id. at 576. /

In Cason, the plaintiffs and proposed class challenged public housing eligibility criteria that required applicants to prove that they were capable of living independently, or to live independently with minimal aid. It was proven that housing was denied only to handicapped applicants on the basis of an inability to live independently and that on non-handicapped persons were denied on the basis of this criteria. In finding disparate impact, the court rejected defendants' argument that there was no discriminatory effect because only 17 of 276 handicapped applicants had been denied for their inability to live independently. The court observed that the defendant Housing Authority improperly measured effect, which was proven by showing that the eligibility criteria had a greater effect on the handicapped, and that, in fact, only the handicapped were effected. The court granted class certification for all 276 applicants since the plaintiffs complained

about practices and procedures employed by defendants beyond the denial of 17 applicants.

In the universe of mixed occupancy housing, the proper comparison is between (1) persons with disabilities seeking low income housing from the BHA, and (2) elderly people similarly seeking a public housing apartment. This comparison "allows for a causal analysis between the claim of discrimination based on handicap and the facially neutral practice. See: Tsombanidis v. West Haven Fire Department, 352 F.3d at 577.

Williamsburg provides an especially apt comparison because certain of the plaintiffs there, such as veterans, enjoyed federally created priority rights to housing. The Williamsburg court affirmed that even unintentionally ignoring these priorities would create a discriminatory effect, id. at 1247. In the same way, ignoring the rights of disabled plaintiffs in this case to a preference for Fireside had a discriminatory effect on them

There is no dispute that only the disabled are adversely impacted by the BHA's eligibility criteria. The elderly are unaffected, or they are affected in a positive manner in that age 50 is a lowering from 62 of the age admissions criteria. All disabled applicants and candidates for transfer are subjected to an additional eligibility criteria that is not authorized by law. Additionally, a sub-group of disabled between the age of contract,

18, and 49 in its entirety, is absolutely precluded from ever receiving an apartment at

Fireside.   Disparate impact, therefore, clearly exists.


                              Respectfully submitted,

                              THE PLAINTIFFS

                                   By_____
                                   Alan Rosner (CT10414)
                              1115 Main Street, Suite 415
                                   Bridgeport, CT 06604
                                   Tel.(203) 384-1245
                                   Fax. (203) 384-1246

                                   Email: alanrosner@aol.com

## **CERTIFICATION**

This is to certify that a copy of the foregoing has been delivered by overnight courier mail service on this 24th  day of September, 2004 to:

Michael Ryan and James Mahar
Ryan, Ryan, Johnson & Deluca, LLP
80 Fourth Street, P.O. Box 3057
Stamford, CT 06905-3057


_____
Commissioner of Superior Court